# United States Court of Appeals for the Federal Circuit

---

**ROBERT M. EUZEBIO,**
*Claimant-Appellant*

**v.**

**DENIS MCDONOUGH, SECRETARY OF VETERANS AFFAIRS,**
*Respondent-Appellee*

---

2020-1072

---

Appeal from the United States Court of Appeals for Veterans Claims in No. 17-2879, Judge Michael P. Allen, Judge Amanda L. Meredith, Judge Joseph L. Falvey, Jr.

---

Decided: March 3, 2021

---

ZACHARY STOLZ, Chisholm Chisholm & Kilpatrick, Providence, RI, argued for claimant-appellant. Also represented by CHRISTOPHER J. CLAY, BARBARA J. COOK, APRIL DONAHOWER; MEGAN BRITTNEY HALL, Disabled American Veterans, Cold Spring, KY.

MARTIN F. HOCKEY, JR., Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent-appellee. Also represented by JEFFREY B. CLARK, ROBERT EDWARD KIRSCHMAN, JR.; MARTIE ADELMAN, BRIAN D. GRIFFIN, Office of General

Counsel, United States Department of Veterans Affairs, Washington, DC.

HILLARY ANNE WANDLER, Veterans Advocacy Clinic, Alexander Blewett III School of Law, University of Montana, Missoula, MT, for amicus curiae National Law School Veterans Clinic Consortium.    Also represented by MITCHELL L. WERBELL, V.

DORIS JOHNSON HINES, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, Washington, DC, for amicus curiae National Veterans Legal Services Program. Also represented by JOHN D. NILES, BARTON F. STICHMAN, National Veterans Legal Services Program, Washington, DC.

―――――――――――――

Before O'MALLEY, WALLACH, and TARANTO, *Circuit Judges.*

WALLACH, *Circuit Judge.*

Appellant, Robert M. Euzebio, appeals a decision of the U.S. Court of Appeals for Veterans Claims ("Veterans Court"). *See Euzebio v. Wilkie*, 31 Vet. App. 394 (2019). **T**he Veterans Court affirmed the Board of Veterans' Appeals' ("the Board") denial of Mr. Euzebio's entitlement to service connection for a thyroid condition "as due to exposure to Agent Orange[.]" *Id.* at 397; *see* J.A. 22 (Judgment). The Veterans Court held that, contrary to Mr. Euzebio's arguments, the National Academies of Sciences, Engineering & Medicine's ("NAS") report, *Veterans and Agent Orange: Update 2014* (10th Biennial Update 2016) ("*NAS Update 2014*"), "was not constructively before the Board" and Mr. Euzebio "ha[d] not demonstrated prejudicial error in the Board's decision to decline to obtain a medical nexus opinion" to evaluate whether Mr. Euzebio's thyroid condition is associated with his exposure to Agent Orange. *Euzebio*, 31 Vet. App. at 397.

We have jurisdiction pursuant to 38 U.S.C. § 7292(a) and (c). Because the Veterans Court applied an erroneous legal standard when it concluded the Board did not have constructive possession of the *NAS Update 2014*, we vacate and remand.

## BACKGROUND

### I. The NAS Agent Orange Reports

Agent Orange was "the most widely used herbicide" during the Vietnam War. S. REP. NO. 100-439, at 64 (1988); *see id.* at 64–65 (providing that the United States dispersed "[a]pproximately [twenty] million gallons of herbicides . . . in Vietnam, including approximately [eleven] million gallons of Agent Orange" from 1962 to 1971). Agent Orange consisted of an equal mixture by weight of two n-butyl esters of phenoxy acid herbicides, 2,4-dichlorophenoxyacetic acid, and 2,4,5-trichlorophenoxyacetic acid. *Id.* at 64. It also contained a synthetic contaminant, 2,3,7,8-tetrachlorodibenzo-para-dioxin, commonly called "dioxin." *Id.* "The United States used herbicides in Vietnam primarily for defoliation, crop destruction, and, on a smaller scale, clearing vegetation around U.S. fire bases and other installations, around landing zones, and along lines of communication." *Id.* In 1969, following a National Institutes of Health report indicating that 2,4,5-trichlorophenoxyacetic acid "could cause birth defects in mice, the Government restricted the use of Agent Orange in Vietnam to areas remote from population," and from "1970 to 1971, the use of herbicides was phased out[.]" *Id.*

### A. Individual and Class Actions

In 1979, Vietnam veterans and their families filed what would become a class action tort suit in the U.S. District Court for the Eastern District of New York against the United States and "a major portion of the chemical industry," seeking damages for injuries to and the deaths of "tens of thousands of Vietnam veterans who came in contact with

herbicides"—in particular, Agent Orange. *In re Agent Orange Prod. Liab. Litig.* (*Agent Orange I*), 597 F. Supp. 740, 746 (E.D.N.Y. 1984), *aff'd sub nom. In re Agent Orange Prod. Liab. Litig. MDL No. 381* (*Agent Orange II*), 818 F.2d 145 (2d Cir. 1987). The district court considered it "one of the most complex litigations ever brought," with "[s]ome [six hundred] separate cases" and "an estimated fifteen thousand named plaintiffs," with "[h]undreds of motions" filed and "[m]illions of pages of documents and hundreds of depositions of witnesses" collected into evidence. *Id.* at 749–50. After five years of litigation, "plaintiffs, on behalf of a class of Vietnam veterans and members of their families, agreed with defendants to settle their claims against the defendant chemical companies," for "$180 million plus interest" in damages. *Id.* at 748. On behalf of the class, the district court held that the settlement was "reasonable under the law," *Agent Orange I*, 597 F. Supp. at 749, and the Second Circuit affirmed, *Agent Orange II*, 818 F.2d at 174.

The Government did not "participate in the negotiations that culminated in the settlement of th[at] class action." *Agent Orange II*, 818 F.2d at 160. Rather, the plaintiffs' claims against the United States were dismissed as "barred by the *Feres* doctrine and the discretionary function exception to the Federal Tort Claims Act." *Id.* at 152; *see Feres v. United States*, 340 U.S. 135, 146 (1950) (holding that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service"). Veterans also pursued their claims against the United States through what is now called the U.S. Department of Veterans Affairs ("VA"), seeking disability compensation for diseases they asserted were caused by exposure to Agent Orange. H.R. REP. NO. 98-592, at 6 (1984) (providing that "as of October 1, 1983, Veterans had filed 18,518 disability claims with the VA for disorders they attribute to Agent Orange exposure"; of those, "9,170 . . . had a

diagnosed disability"; and, of those, "7,709 were denied" disability compensation for lack of service connection (capitalization normalized)). The VA took the position that only chloracne, a skin disorder, was "causally related to Agent Orange exposure" and largely denied the veterans' Agent Orange claims. *Id.* (capitalization normalized); *see id.* (noting that of the 18,518 disability claims for Agent Orange exposure, the "1,461 . . . [that] were granted service connection were for skin conditions" (capitalization normalized)).

## B. The Dioxin Act

In 1984, in response to "concern," generally, "about the decision[-]making process within the [VA] with respect to Agent Orange compensation," and, specifically, to the absence of "standards or guidelines available by which the [VA] justifie[d] its position that no illness, except chloracne, result[ed] from Agent Orange exposure," H.R. REP. NO. 98-592, at 21 (capitalization normalized), Congress enacted the Veterans' Dioxin and Radiation Exposure Compensation Standards Act ("Dioxin Act"), Pub. L. No. 98–542, 98 Stat. 2725 (1984). Given the "scientific and medical uncertainty regarding [the] long-term adverse health effects" resulting from dioxin exposure, Congress had previously "authoriz[ed] priority medical care at [VA] facilities for any disability of a veteran who may have been . . . exposed [to dioxin]," even where "there [wa]s insufficient medical evidence linking such disability with such exposure," "unless the disability [wa]s found to have resulted from a cause other than the exposure." Dioxin Act § 2(2), (3) (citing An Act to Make Technical Corrections in the Defense Officer Personnel Management Act, Pub. L. No. 97–22 § 102, 95 Stat. 124 (1981)). However, the VA had yet to "promulgate[] permanent regulations setting forth guidelines, standards, and criteria for the adjudication of claims for [VA] disability compensation based on exposure to herbicides containing dioxin[.]" *Id.* § 2(11).

With the Dioxin Act, Congress sought "to ensure that [VA] disability compensation [wa]s provided to veterans who were exposed" to Agent Orange, for disabilities that were service-connected "based on sound scientific and medical evidence[.]" *Id.* § 3. The Dioxin Act required the VA to "prescribe regulations . . . for the resolution of [Agent Orange] claims" based on "exposure during service" in Vietnam, *id.* § 5(a)(1)(A), including "guidelines governing the evaluation of the findings of scientific studies relating to the possible increased risk of adverse health effects of exposure to herbicides containing dioxin," *id.* § 5(b)(1)(A). The Dioxin Act further required the VA, "in the evaluation of [such] studies," *id.*, to "receiv[e] the advice of" a panel of individuals drawn from "the Scientific Council of the Veterans' Advisory Committee on Environmental Hazards" ("the Dioxin Council") as created within the VA by the Dioxin Act, *id.* § 5(b)(1)(B). The Dioxin Act directed the VA to create a presumptive service connection for any disease which had, "based on sound medical and scientific evidence," *id.* § 5(b)(2)(A), "a connection to exposure to a[n] herbicide containing dioxin," *id.* §5(b)(2)(B); *see LeFevre v. Sec'y, Dep't of Veterans Aff'rs.*, 66 F.3d 1191, 1193 (Fed. Cir. 1995) (explaining that the Dioxin Act "require[d] the [VA] to create or reject a presumption-of-service connection for particular diseases, based upon the statistical probability of such connection, as reflected in scientific studies").

In April 1985, the VA published a proposed rule to implement the Dioxin Act. Adjudication of Claims Based on Exposure to Dioxin or Ionizing Radiation ("Proposed Rule"), 50 Fed. Reg. 15,848 (Apr. 22, 1985). The Proposed Rule provided "a formal process for the [VA's] evaluations of scientific and medical studies relating to the possible adverse health effects of dioxin[.]" *Id.* at 15,848. In August 1985, the VA promulgated a final regulation adopting the Proposed Rule. Adjudication of Claims Based on Exposure to Dioxin or Ionizing Radiation ("Dioxin Regulation"), 50 Fed. Reg. 34,452, 34,452–53 (Aug. 26, 1985) (formerly

codified at 38 C.F.R. § 1.17). It concluded that "[s]ound scientific and medical evidence d[id] not establish a cause and effect relationship between dioxin exposure" and any disease except chloracne. *Id.* at 34,458. It did, however, provide that "[f]rom time to time, the [VA] shall publish evaluations of scientific or medical studies relating to the adverse health effects of exposure to [dioxin]," *id.* at 34,458, and that "[i]n the adjudication of individual claims, due consideration shall be given to th[ose] evaluations of study findings published," *id.* at 34,459. In subsequent years, the Dioxin Council "continued to evaluate scientific studies, reviewing over seventy studies, reports, and articles on dioxin." *Nehmer v. U.S. Veterans' Admin.* (*Nehmer II*), 712 F. Supp. 1404, 1408 (N.D. Cal. 1989). The Dioxin Council did not, however, "recommend[] that the [VA] amend the regulation to grant service connection to any other disease." *Id.*

In 1987, Vietnam veterans brought a class action suit against the VA and Dioxin Council in the U.S. District Court for the Northern District of California, alleging that the agency "improperly implemented" the Dioxin Act through promulgation of the Dioxin Regulation. *Nehmer v. U.S. Veterans' Admin.* (*Nehmer I*), 118 F.R.D. 113, 115 (N.D. Cal. 1987); *see id.* (explaining that plaintiffs alleged that "defendants failed to adequately review the pertinent scientific studies of dioxin-related diseases, failed to impose proper guidelines for the consideration of relevant evidence, and failed to apply the correct legal standard to determine which diseases are compensable" and that "the [Dioxin] [R]egulation contradict[ed] the weight of scientific evidence and is therefore arbitrary and capricious"). While the Dioxin Regulation did "not preclude a veteran from proving in an individual case that a claimed disease was caused by Agent Orange exposure," "as of December 1987, over 31,000 veterans ha[d] been denied compensation under th[e] [Dioxin] [R]egulation." *Nehmer II*, 712 F. Supp. at 1408 (citing *Nehmer I*, 118 F.R.D. at 120). The district

court held "void . . . the portion of the Dioxin [R]egulation that denie[d] service connection for all other diseases" and "all benefit decisions made under [that portion of the regulation], and remand[ed] to the VA for further proceedings[.]" *Id.* at 1409. The district court explained that the VA's "adoption of [a] cause and effect test and failure to give the benefit of the doubt to veterans violated the Dioxin Act," "sharply tipped the scales against the claims of veterans," and thus, "[g]iven the congressional finding of substantial scientific uncertainty regarding the effects of Agent Orange," were "not harmless" errors, but likely "account[ed] for the conclusion that the [VA] reached in the Dioxin [R]egulation." *Id.*

In May 1989, the VA announced that it would "abide by the ruling" in *Nehmer II*, S. REP. NO. 101-82, at 42 (1989), and amended the Dioxin Regulation accordingly, Evaluation of Studies Relating to Health Effects of Dioxin and Radiation Exposure, 54 Fed. Reg. 40,388, 40,388 (Oct. 2, 1989). The VA amended the Dioxin Regulation to provide for a presumptive service connection where the Dioxin Council found "a significant statistical association . . . between any disease and exposure to a[n] herbicide containing dioxin"—that is, "when the relative weights of valid positive and negative studies permit the conclusion that it is at least as likely as not that the purported relationship between a particular type of exposure and a specific adverse health effect exists." *Id.* at 40,391. It did not preserve the provision for consideration of the Dioxin Council's evaluation of scientific and medical studies in the adjudication of individual claims. *See generally id.* at 40,391–92.

### C. The Agent Orange Act

In 1991, Congress enacted the Agent Orange Act of 1991 ("Agent Orange Act"), Pub. L. No. 102–4, 105 Stat. 11 (1991) (codified in part at 38 U.S.C. § 1116), in order to "provide for the Secretary of Veterans Affairs [('the Secretary')] to obtain independent scientific review of the

available scientific evidence regarding associations between diseases and exposure to dioxin and other chemical compounds in herbicides[.]" Agent Orange Act, 105 Stat. at 11. While praising the VA for "proceeding to carry out a rereview of the scientific evidence as part of [its] effort to comply with the mandate of" the Dioxin Act and *Nehmer II*, there was nonetheless "a strong sense that what [wa]s needed at th[at] point [wa]s a review, by an entity completely independent of [the] VA, that will yield unified compilation and analysis of the results from the various scientific studies." S. REP. NO. 101-82 at 42 (1989); *see id.* at 41 (noting that "[g]eneral acceptance of the[] [Dioxin Council's] reviews has been impaired because of a concern that [the] VA may have exerted some influence on their content," and "recogniz[ing] that the perception of a possibility of some taint d[id] exist and [could ]not be dismissed out of hand").

To this end, in the Agent Orange Act, Congress directed the VA to "seek to enter into an agreement with [the NAS]," Agent Orange Act § 3(b), "an independent nonprofit scientific organization with appropriate expertise which is not part of the . . . Government," *id.* § 3(a). Under this agreement, the NAS was to "review and summarize the scientific evidence, and assess the strength thereof, concerning the association between exposure to," inter alia, Agent Orange "and each disease suspected to be associated with such exposure," *id.* § 3(c), and transmit to the VA and Congress "periodic written reports regarding the [NAS's] activities under the agreement" ("NAS Reports"), with a report "submitted at least once every two years" through October 1, 2014, *id.* § 3(g), (i); *see* Veterans Education and Benefits Expansion Act of 2001 ("Veterans Education Act"), Pub. L. No. 107–103, § 201, 115 Stat. 976 (2001).

In generating the NAS Reports, the "NAS conduct[s] a comprehensive search of all medical and scientific studies on health effects of herbicides used in the Vietnam War"—numbering in the thousands for each biannual NAS

Report.  Determinations Concerning Illnesses Discussed in National Academy of Sciences Report: Veterans and Agent Orange: Update 2012 ("NAS Update 2012 Determination"), 79 Fed. Reg. 20,308, 20,309 (Apr. 11, 2014).  The NAS then categorizes "each health outcome it reviewed . . . based on the strength of the evidence of association between herbicide exposure and the health outcome," ranging from "Sufficient Evidence of Association" to "Limited or Suggestive Evidence of No Association." *Id.*

Until September 30, 2015, the Secretary was required, within sixty days of receiving an NAS Report, to "determine whether a presumption of service connection is warranted for each disease covered by the [NAS] [R]eport." 38 U.S.C. § 1116(c)(1)(A); *see* Veterans Education Act § 201 (codified at 38 U.S.C. § 1116(e)).  "If the Secretary determine[d] that such a presumption [wa]s warranted," the Secretary was required, within sixty days of making that determination, to "issue proposed regulations setting forth the Secretary's determination," 38 U.S.C. § 1116(c)(1)(A), and, within ninety days of issuing the proposed regulation, to issue a final regulation, *id.* § 1116(c)(2); *see* 38 C.F.R. § 3.309 (listing "[d]isease[s] subject to presumptive service connection").  Similarly, the Secretary was required to "publish in the Federal Register . . . notice" when "the Secretary determine[d] that a presumption of service connection [wa]s not warranted" for a given disease.  38 U.S.C. § 1116(c)(1)(B).[1]

---

[1]    In 1993, the VA promulgated regulations implementing the Agent Orange Act.  *See* Disease Associated With Exposure to Certain Herbicide Agents, 58 Fed. Reg. 50,528, 50,528 (Sept. 28, 1993).  In 2010, the VA "amend[ed] its regulation[s] concerning evaluation of studies relating to the health effects of exposure to herbicides containing dioxin . . . to remove the obsolete references to herbicides containing dioxin" to "reflect[] changes made by

In the absence of a presumptive service connection, a veteran may still "prove actual direct causation" to establish a service-connected disability. *Combee v. Brown*, 34 F.3d 1039, 1044 (Fed. Cir. 1994). While the Agent Orange Act and associated regulations do not require the VA to consider NAS Reports in the adjudication of individual claims, *see generally* 38 U.S.C. § 1116, because "[t]he NAS [Reports] are published in the Federal Register by [the] VA," the "VA is on notice as to the information contained therein," J.A. 76; *see* J.A. 71–76 (excerpts from BOARD OF VETERANS' APPEALS, U.S. DEP'T OF VETERANS AFFAIRS, THE PURPLEBOOK, Version 1.0.2 (2018) ("*The Purplebook*")); *see also Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 385 (1947) ("Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents.").

Further, the Board's internal guidance advises that, even if the VA has not "conceded a relationship" by establishing a presumptive service connection, "suggestive evidence of an association" between a medical condition and "exposure to herbicide agents" as discussed in NAS Reports may "be sufficient to establish an 'indication' that the current disability 'may be related' to herbicide agent exposure during service, as contemplated by 38 U.S.C. § 5103A(d)(2)(b)" given "that there is a 'low threshold' when assessing the need for a medical examination." J.A. 76 (quoting *McLendon v. Nicholson*, 20 Vet. App. 79, 83 (2006)); *see* 38 U.S.C. § 5103A(d)(1) (directing the VA to

---

the Agent Orange Act[.]" Removal of Obsolete References to Herbicides Containing Dioxin ("Removal of Obsolete References"), 75 Fed. Reg. 17,857, 17,857 (Apr. 8, 2010); *see id.* at 17,858 (explaining that prior regulations under the Dioxin Act were "obsolete with regard to matters involving herbicide exposure, which are now governed by the comprehensive statutory scheme of the Agent Orange Act").

provide a veteran with a "medical examination" or "opinion" "when such an examination or opinion is necessary to make a decision on the [veteran's disability] claim"). For example, by its internal guidance, the Board should "not deny service connection for hypertension, bladder cancer, or hypothyroidism without first obtaining a VA medical opinion" on the question of service connection, J.A. 75, even though "the VA has not conceded" a presumptive service connection, J.A. 76; *see* J.A. 76 ("On a practical basis, for the above reasons, [the VA's Office of General Counsel's] [Veterans Court] Litigation Group will not defend service connection for hypertension cases when a VA nexus opinion has not been obtained[.]").

## II. Factual Background and Procedural History

Mr. Euzebio served on active duty in the U.S. Navy Seabees from February 1966 to October 1969, including two tours of duty in Vietnam. J.A. 31 (DD 214), 40 (Claim), 51 (Supplemental Claim). He was stationed first in Da Nang and then in Hoi An. J.A. 51, 57. At both sites, he was exposed to Agent Orange. J.A. 57; *see* 38 U.S.C. § 1116(f) ("For purposes of establishing service connection for a disability or death resulting from exposure to a[n] herbicide agent, . . . a veteran who, during active military, naval, or air service, served in the Republic of Vietnam during the period beginning on January 9, 1962, and ending on May 7, 1975, shall be presumed to have been exposed during such service to an herbicide agent containing dioxin or 2,4-dichlorophenoxyacetic acid[.]"); 38 C.F.R. §§ 3.307(a)(6)(iii) (similar), 3.313(a) (providing that "[s]ervice in Vietnam includes service in the waters off-shore, or service in other locations if the conditions of service involved duty or visitation in Vietnam").

In 2009, Mr. Euzebio began experiencing problems swallowing. J.A. 58. In 2011, medical examinations and testing by private physicians indicated that he had benign nodules on his thyroid. J.A. 32–39 (Radiology and

Pathology Reports), 57–59 (Board Transcript).  Later that year, Mr. Euzebio filed a claim requesting service-connected disability compensation for "thyroid nodules believed [to be] caused by [his] exposure to Agent Orange while serving in Vietnam."  J.A. 40 (Claim).[2]  The VA denied his claim, finding that "[t]he available scientific and medical evidence does not support the conclusion that [Mr. Euzebio's thyroid] condition is associated with herbicide exposure."  J.A. 47; *see* J.A. 43–49 (September 2011 VA Letter).  In April 2015, after filing a supplemental claim with the VA, Mr. Euzebio appealed the VA's decision to the Board.  J.A. 50–51 (Supplemental Claim), 52–53 (Notice of Disagreement), 54 (Appeal to Board).

In March 2016, while Mr. Euzebio's appeal was pending before the Board, the NAS Committee to Review the Health Effects in Vietnam Veterans of Exposure to Herbicides published the *NAS Update 2014*.  J.A. 70, 76.  At that time, while the NAS was still required to "transmit to the [VA] and [Congress]" an NAS Report, Agent Orange Act § 3(g); *see* Veterans Education Act § 201, the VA was no longer required to use that NAS Report to determine if any new presumptive service connections were warranted or to publish such determinations for notice and comment in the Federal Register, 38 U.S.C. § 1116(e).  While the VA has not, to date, published the *NAS Update 2014* in the Federal Register, it has published the report on its website.  *See* U.S. DEP'T OF VETERANS AFFAIRS, *Public Health*, https://www.publichealth.va.gov/exposures/agentorange/

---

[2]    Mr. Euzebio also claimed service connection based on his exposure to contaminated drinking water at Camp Lejeune.    J.A. 60; *see* 38 C.F.R. § 3.309(f) (listing "[d]isease[s] [presumptively] associated with exposure to contaminants in the water supply at Camp Lejeune").  He has since abandoned that claim.  *See Euzebio*, 31 Vet. App. at 407; *see generally* Appellant's Br.

publications/health-and-medicine-division.asp.   The *NAS Update 2014* provided that in one study considered by the NAS Committee, "thyroid conditions overall showed an indication of increased risk with herbicide exposure." J.A. 78 (alterations omitted) (quoting *NAS Update 2014* at 885). The NAS Committee also noted that "consistent observations of exposures to herbicide agents" indicated that they were "related to perturbations of thyroid function" and that "[e]ndocrine effects have been observed in conjunction with exposure to herbicide agents in both humans and animals." J.A. 78 (alterations omitted) (quoting *NAS Update 2014* at 897–98).

In July 2017, the Board denied Mr. Euzebio's claim. J.A. 60–61; *see* J.A. 60–69 (Board Decision).  The Board concluded that Mr. Euzebio "ha[d] not . . . met" "[t]he criteria for service connection for a thyroid disability," finding that Mr. Euzebio's "benign thyroid nodules ha[d] not been shown to be related to his in-service environmental exposures." J.A. 61.  The Board noted that "[t]he Agent Orange Act . . . requires that when the Secretary determines that a presumption of service connection based on herbicide exposure is not warranted for [certain] conditions, he must," inter alia, consider "reports of the [NAS]" when making the decision.  J.A. 66 (citing 38 U.S.C. § 1116); *see* 38 U.S.C. § 1116(b)(2) ("In making determinations for the purpose of" creating presumptive service-connection for certain diseases associated with Agent Orange exposure, the Secretary is required to "take into account . . . reports received by the Secretary from the [NAS] under . . . the Agent Orange Act," and "all other sound medical and scientific information and analyses available to the Secretary[.]").

The Board then concluded that, while Mr. Euzebio "ha[d] not been afforded a VA [medical] examination," the VA was not required to provide him with one because Mr. Euzebio's "conclusory generalized statements" that "his thyroid condition is related to his in-service exposures to Agent Orange" "lack probative value and are insufficient

to meet even the low burden triggering [the] VA's duty to assist in providing an examination and medical opinion." J.A. 63–64 (citing *McLendon*, 20 Vet. App. at 83); *see* 38 U.S.C. § 5103A(d)(2)(B) (providing that a medical opinion is necessary when "the evidence of record before the Secretary, taking into consideration all information and lay or medical evidence (including statements of the claimant) . . . indicates that the disability or symptoms may be associated with the claimant's active military, naval, or air service").[3] The Board explained that "[s]ervice connection" for Mr. Euzebio's thyroid disorder "[wa]s not warranted" either "on a presumptive basis," because his thyroid disorder was not among the conditions listed by the Secretary for presumptive service-connection under the Agent Orange Act, J.A. 67 (citing 38 C.F.R. § 3.309(e)); *see* 38 C.F.R. § 3.309(e) (listing "[d]isease[s] [presumptively] associated with exposure to certain herbicide agents"), or on "a direct basis" because "[t]he only evidence submitted etiologically linking [Mr. Euzebio's] benign thyroid nodules to his in-service exposures is [his] own assertion[s]," J.A. 68; *see* J.A. 68 (concluding that Mr. Euzebio's "general conclusory

---

[3]    *McLendon* provides that "the Secretary must provide a VA medical examination when there is," inter alia, "an indication that the disability or persistent or recurrent symptoms of a disability may be associated with the veteran's service or with another service-connected disability, but . . . insufficient competent medical evidence on file for the Secretary to make a decision on the claim." 20 Vet. App. at 81 (citing, inter alia, 38 U.S.C. § 5103A(d)(2)); *see* *Waters v. Shinseki*, 601 F.3d 1274, 1277 (Fed. Cir. 2010) (noting that 38 U.S.C. § 5103A(d)(1), (2) "provide[s] th[e] guidelines for determining whether a medical examination or opinion is necessary for the Secretary to make a decision in a claim" (internal quotation marks omitted)).

assertions as to the cause of his benign thyroid nodules, while likely genuine, are not probative in this context").

Mr. Euzebio appealed the Board's decision to the Veterans Court. *Euzebio*, 31 Vet. App. at 397; *see* J.A. 70 (excerpt of Veterans Court Brief). Mr. Euzebio argued that "the Board erred in determining that the Secretary's duty to assist did not require [the] VA to afford him a medical examination," because "the Board failed to consider and discuss 'all evidence and material of record and applicable provisions of law and regulation,' including the [*NAS Update 2014*]." *Euzebio*, 31 Vet. App. at 398 (quoting 38 U.S.C. § 7104(a)). He argued that "the [*NAS Update 2014*] was constructively before the Board because the Secretary knew of the report's content," and further "that, had the Board considered the [*NAS Update 2014*], it would have found . . . *McLendon* . . . satisfied." *Id.* Before the Veterans Court, it was undisputed that the *NAS Update 2014* "was created for [the] VA pursuant to a congressional mandate" and "was published in 2016, prior to the Board decision on appeal," *id.* at 399, and, further, that the "VA generally knew of the existence of the [*NAS Update 2014*] at the time of the decision on appeal," *id.* at 402; *see* J.A. 76 (*The Purplebook*) (discussing, generally, the use of NAS Updates in adjudicating Agent Orange claims, and, specifically, the *NAS Update 2014* in adjudicating certain Agent Orange claims without presumptive service connection).

A divided panel of the Veterans Court affirmed the Board's decision. *Euzebio*, 31 Vet. App. at 397. The majority "conclude[d] that the [*NAS Update 2014*] was not constructively . . . before the Board." *Id.* at 402. The majority explained that the Veterans Court "case[ ]law is clear, that even if [the] VA is aware of a report and the report contains general information about the type of disability on appeal, that is insufficient to trigger the constructive possession doctrine[.]" *Id.* Rather, "there must also be a direct relationship to the claim on appeal." *Id.* (emphasis omitted) (citing *Monzingo v. Shinseki*, 26 Vet. App. 97, 102 (2012)).

The majority stated that "[t]o hold otherwise would not only contravene [the Veterans] Court's case[ ]law but would undermine the [Veterans] Court's jurisdictional obligation to base its review on the record of proceedings before the Board[.]" *Id.*; *see* 38 U.S.C. § 7252(b) ("Review in the Court shall be on the record of proceedings before the Secretary and the Board."). The majority then determined that the Board correctly concluded that the VA had satisfied its duty to assist under *McLendon*, *see Euzebio*, 31 Vet. App. at 407 ("[Mr. Euzebio] has not shown that the record contains any factual basis for his claim apart from his general lay statements, which, as noted above, are insufficient to satisfy *McLendon*'s low threshold."), and, because Mr. Euzebio "ha[d] not demonstrated prejudicial error with regard to that determination," the majority affirmed, *id.*

One judge dissented. *Euzebio*, 31 Vet. App. at 407–12 (Allen, J., dissenting). He understood the majority's rationale to be a constructive ignorance rather than a constructive possession doctrine, as the majority's opinion could not "possibly be the outcome of a rational system of adjudication, especially one designed to be pro-veteran and nonadversarial." *Id.* at 409. He explained that, while "[t]he majority appear[ed] to suggest that there is quite a rigorous test to show [a direct] relationship"—such that "for all practical purposes, only evidence that directly names the veteran whose case is at issue would qualify"—the majority was incorrect. *Id.* He emphasized "the[] unique nature" of the NAS Reports and the "important role congressional attention to Agent Orange exposure has" had in the adjudication of Agent Orange claims. *Id.* at 410; *see id.* at 410 ("These are not the type of documents that are located somewhere in the bowels of [the] VA, tucked away in the desk of some bureaucrat never to be read."). Because the VA had actual notice of the *NAS Update 2014*, and because the *NAS Update 2014* has a direct relationship to "all claims based on Agent Orange exposure" by "congressional directive," he would have found the *NAS Update 2014* to be

constructively before the Board in Mr. Euzebio's case.  *Id.* at 410–11.

## DISCUSSION

### I. Standard of Review and Legal Standard

Our jurisdiction to review decisions of the Veterans Court is defined by statute.  *Gazelle v. Shulkin*, 868 F.3d 1006, 1009 (Fed. Cir. 2017).  We may "review and decide any challenge to the validity of any statute or regulation or any interpretation thereof" and "interpret constitutional and statutory provisions, to the extent presented and necessary to a decision."  38 U.S.C. § 7292(c).  "[W]e have authority to decide whether the Veterans Court applied the correct legal standard."  *Sneed v. Shinseki*, 737 F.3d 719, 724 (Fed. Cir. 2013) (internal quotation marks, citation, and footnote omitted).  We review the Veterans Court's legal determinations de novo.  *Gazelle*, 868 F.3d at 1009.

The Veterans Court is "an Article I tribunal," created under the Veterans' Judicial Review Act of 1988 ("Veterans' Judicial Review Act"), Pub. L. No. 100–687, 102 Stat. 4105 (2000) (codified as amended at 38 U.S.C. §§ 7251–7298), "to review Board decisions adverse to veterans." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 432 (2011).  As an appellate tribunal, the Veterans Court reviews Board determinations "on the record of proceedings before the Secretary and the Board."  38 U.S.C. § 7252(b).[4]

---

[4]    The Board's "[d]ecisions," in turn, must "be based on the entire record in the proceeding and upon consideration of all evidence and material of record," 38 U.S.C. § 7104(a), and, in adjudicating claims for service-connected disability, the Secretary must consider "all information and lay and medical evidence of record," *id.* § 5107(b); *see Fagan v. Shinseki*, 573 F.3d 1282, 1287 (Fed. Cir. 2009) ("We have repeatedly emphasized that all pertinent evidence must be considered."); 38 C.F.R. § 3.303 ("Determinations

"[T]he Veterans Court's scope of review, [38 U.S.C.] § 7261, is similar to that of an Article III court reviewing agency action under the Administrative Procedure Act, 5 U.S.C. § 706." *Henderson*, 562 U.S. at 432 n.2. The Veterans Court "decide[s] all relevant questions of law," 38 U.S.C. § 7261(a)(1), and "hold[s] unlawful and set[s] aside any [Board or VA] decision[]" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 7261(a)(3)(A). Further, "in the case of a finding of material fact adverse to the claimant," the Veterans Court may "hold unlawful and set aside or reverse such finding if the finding is clearly erroneous." *Id.* § 7261(a)(4). Under such circumstances, the Veterans Court has the "power to . . . reverse a decision of the Board or to remand the matter, as appropriate[.]" *Id.* § 7252(a).

In keeping with its appellate review of Board and VA determinations, the Veterans Court may, under certain circumstances, consider "documents that were not literally before an examiner to be constructively part of a claimant's record." *Lang v. Wilkie*, 971 F.3d 1348, 1352–53 (Fed. Cir. 2020) (emphasis omitted) (citing *Bell v. Derwinski*, 2 Vet. App. 611, 613 (1992)); *cf. Home Prod. Int'l, Inc. v. United States*, 633 F.3d 1369, 1379 (Fed. Cir. 2011) (explaining that the rule that appellate review of agency proceedings must be on the administrative record "is not without exceptions" (citing, inter alia, *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985))). Specifically, where "a dispute arises" before the Veterans Court "as to the content of the record" before the Secretary and Board, and the evidence at issue is "within the Secretary's control" and "could reasonably be expected to be a part of the record 'before the Secretary and the Board,' such documents are," constructively, part of the record. *Bell*, 2 Vet. App. at 613 (quoting

as to service connection will be based on review of the entire evidence of record[.]").

38 U.S.C. § 7252(b)); *see Lang*, 971 F.3d at 1353–55 (discussing the "well-established *Bell* rule"); 38 C.F.R. § 20.1403(b) (codifying the *Bell* rule for "Board decisions on legacy appeals" for claims that pre-date *Bell*).[5] The Veterans Court has found evidence "within the Secretary's control" when "the Secretary ha[s] constructive, if not actual, knowledge" of that evidence. *Bell*, 2 Vet. App. at 613; *see Lang*, 971 F.3d at 1354 (providing that the VA has constructive knowledge of evidence that was "generated by the VA or was submitted to the VA").[6]  Evidence that "could reasonably be expected to be part of the record" is evidence that "pre-date[s] the [Board] opinion" and is relevant. *Bell*, 2 Vet. App. at 612–13; *see Lang*, 971 F.3d at 1353–55 ("[I]n the context of records created prior to a decision, *all* relevant and reasonably connected VA-generated documents are part of the record and, therefore, constructively known by the VA adjudicator.").

## II. The Veterans Court Relied on an Erroneous Legal Standard When It Required a "Direct Relationship" for Constructive Possession of the *NAS Update 2014*

The Veterans Court "conclude[d] that the [*NAS Update 2014*] was not constructively" before the Board, because "even if [the] VA [wa]s aware of a report and the report

---

[5] "After *Bell*, the Secretary issued Office of General Counsel Opinion 12-95, which officially adopted the *Bell* rule for all [medical] records in the VA's possession." *Lang*, 971 F.3d at 1353 (citing Vet. Aff. Op. Gen. Couns. Prec. 12-95, 1995 WL 17875505, at *2 (May 10, 1995)).

[6] While actual notice is not necessary, *Lang*, 971 F.3d at 1355, it is sufficient, *Bell*, 2 Vet. App. at 612 ("[T]he [Veterans] Court cannot accept the Board being 'unaware' of certain evidence, especially when such evidence is in possession of the VA, and the Board is on notice as to its possible existence and relevance." (quoting *Murincsak v. Derwinski*, 2 Vet. App. 363, 372–73 (1992))).

contain[ed] general information about the type of disability on appeal, that [wa]s insufficient to trigger the constructive possession doctrine." *Euzebio*, 31 Vet. App. at 402 (emphasis and footnote omitted). The Veterans Court explained that "there must also be a direct relationship to the claim on appeal" and there was no direct relationship between the *NAS Update 2014* and Mr. Euzebio's claim. *Id.* Mr. Euzebio argues that the Veterans Court "relied on an erroneous legal standard when it refused to consider the [*NAS Update 2014*] because it lacked a 'direct relationship' to Mr. Euzebio's claim." Appellant's Br. 8. We agree with Mr. Euzebio.

Mr. Euzebio is correct that the Veterans Court relied on an erroneous legal standard when it required Mr. Euzebio establish a "direct relationship" between the *NAS Update 2014* and his claim. The constructive possession doctrine provides that evidence that is "within the Secretary's control" and "could reasonably be expected to be a part of the record 'before the Secretary and the Board,'" is constructively part of the administrative record. *Bell*, 2 Vet. App. at 613 (quoting 38 U.S.C. § 7252(b)); *see Lang*, 971 F.3d at 1353–55; 38 C.F.R. § 20.1403(b). However, first in *Monzingo*, and again, here in *Euzebio*, the Veterans Court has narrowed the constructive possession doctrine such that for evidence to be "reasonably . . . expected to be part of the record," it must have a "specific," "direct relationship" to the veteran's claim—i.e., the document must have been created specifically for the veteran. *Monzingo*, 26 Vet. App. at 102–03;[7] *see Euzebio*, 31 Vet. App. at 401

---

7 *Monzingo* was appealed to this court. *Monzingo v. Gibson*, 566 F. App'x 972, 973 (Fed. Cir. 2014). We did not, however, reach the issue of constructive possession, as we concluded that Mr. Monzingo "in effect . . . disagree[d] with the Veterans Court's application of the law to the facts of his case" and "dismiss[ed] for lack of jurisdiction." *Id.*

(summarizing the reasonable expectation element of the constructive possession doctrine as requiring a veteran to "show that there is a direct relationship between the document and his or her claim" (emphasis omitted) (citing *Monzingo*, 26 Vet. App. at 101–03)). This was error.

Requiring that evidence bear a "direct relationship" or be "specific to" the veteran for constructive possession is without basis in relevant statute or regulation. Rather, *Monzingo* derived its "direct relationship" requirement from a prior Veterans Court case, *Goodwin v. West*, 11 Vet. App. 494, 495–96 (1998) (per curiam). *Monzingo*, 26 Vet. App. at 102–03. *Goodwin*, however, only applied *Bell* to conclude that certain documents generated by the VA for "claims for VA benefits for an individual other than the appellant and which were not submitted to [the] VA with regard to the appellant's claim, could not 'reasonably be expected to be a part of the record before the Secretary and the Board.'" *Goodwin*, 11 Vet. App. at 496 (quoting *Bell*, 2 Vet. App. at 613) (some internal quotation marks omitted). This effort to formulate governing legal principles, untethered from statutory and regulatory standards, has led to absurd results. *See United States v. Turkette*, 452 U.S. 576, 580 (1981) ("[A]bsurd results are to be avoided[.]"). The "direct relationship" standard may, for example, fail to encompass a report commissioned by Congress specifically to assist the VA in understanding and evaluating the type of claim at issue, *see* Agent Orange Act, 105 Stat. at 11 (enacted to "provide for the Secretary . . . to obtain independent scientific review of the available scientific evidence

---

Here, the Government does not challenge our jurisdiction. Appellee's Br. 13–14. Indeed, as noted above, we have jurisdiction to consider "whether the Veterans Court applied the correct legal standard." *Sneed*, 737 F.3d at 724 (internal quotation marks, citation, and footnote omitted); *see* 38 U.S.C. § 7292(c).

regarding" Agent Orange), even where the Board had actual knowledge of the report and the report has been part of the record in similar claims, *see* 38 U.S.C. § 5103A(a)(1) (providing that the Secretary must "make reasonable efforts to assist a claimant in obtaining evidence necessary to substantiate the claimant's claim"); H.R. REP. NO. 100-963, at 13 ("Congress expects [the] VA to fully and sympathetically develop the veteran's claim to its optimum before deciding it on the merits.").

Here, it is undisputed that the *NAS Update 2014* "was published in 2016, prior to the Board decision on appeal." *Euzebio*, 31 Vet. App. at 399. It is undisputed that the "VA generally," and the Board specifically, "knew of the existence of the [*NAS Update 2014*] at the time of the decision on appeal." *Id.* at 402; *see* J.A. 76 (*The Purplebook*) (discussing the use of NAS Reports, generally, and the *NAS Update 2014* specifically, in adjudicating Agent Orange claims). The importance and relevance of the NAS Reports to Agent Orange claims are well-known and well-established—they are the result of decades of veteran engagement, *see, e.g.*, *Nehmer I*, 118 F.R.D. at 116; *Nehmer II*, 712 F. Supp. at 1408; *Agent Orange I*, 597 F. Supp. at 749; *Agent Orange II*, 818 F.2d at 174, and of congressional investigation and legislation, *see, e.g.*, Dioxin Act, 98 Stat. 2725; Agent Orange Act, 105 Stat. 11. The NAS Reports exist, by congressional mandate, to give the VA necessary "independent scientific review of the available scientific evidence regarding associations between diseases and exposure to dioxin and other chemical compounds in herbicides[.]" Agent Orange Act, 105 Stat. at 11; *see* Dioxin Act § 3 (explaining that, with the Dioxin Act, Congress sought "to ensure that [VA] disability compensation [wa]s provided to veterans who were exposed" to Agent Orange "based on sound scientific and medical evidence"); H.R. REP. NO. 98-592, at 21 (explaining that the Dioxin Act resulted from Congress's "concern about the decision making process within the [VA] with respect to Agent Orange

compensation," and, specifically, to the absence of "standards or guidelines available by which the [VA] justifie[d] its position that no illness, except chloracne, result[ed] from Agent Orange exposure"); S. REP. NO. 101-82, at 42 (explaining that the Agent Orange Act was necessary to revise the Dioxin Act because, inter alia, Congress had "a strong sense that what [wa]s needed at th[at] point [wa]s a review, by an entity completely independent of [the] VA, that will yield unified compilation and analysis of the results from the various scientific studies" about Agent Orange exposure). A constructive possession doctrine that allows an administrative judge to "ignore [an NAS Report] she knows exists" and knows "contains important . . . information," cannot "possibly be the outcome of a rational system of adjudication, especially one designed to be pro-veteran and non-adversarial." *Euzebio*, 31 Vet. App. at 408–09 (Allen, J., dissenting).

The correct standard for constructive possession, as articulated in *Bell* and later *Lang*, and as applied throughout veterans benefit law, is relevance and reasonableness. *Lang*, 971 F.3d at 1353; *Bell*, 2 Vet. App. at 612–13; *see Golz v. Shinseki*, 590 F.3d 1317, 1323 (Fed. Cir. 2010) ("The relevancy limitation allows [the] VA to focus its efforts on obtaining documents that have a reasonable possibility of assisting claimants in substantiating their claims for benefits."). This is not to say that any and every treatise, text, or medical record must now be part of the administrative record. *See, e.g.*, *AZ v. Shinseki*, 731 F.3d 1303, 1311 (Fed. Cir. 2013) (explaining that "[e]vidence that is insufficiently probative" is not "relevant"). Rather, where the Board has constructive or actual knowledge of evidence that is "relevant and reasonably connected" to the veteran's claim, but nonetheless fails to consider that evidence, *Lang*, 971 F.3d at 1354; *see AZ*, 731 F.3d at 1311 (explaining that, to be "relevant," evidence "must tend to prove or disprove a material fact"), the Veterans Court must ensure that Board and VA decisions are not "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law," 38 U.S.C. § 7261(a)(3)(A), and remand for further consideration or explanation where appropriate, *see id.* § 7252(a) (explaining that the Veterans Court has the "power to . . . reverse a decision of the Board or to remand the matter, as appropriate").

That constructive possession requires relevance and not a direct relationship makes sense in light of the VA's "statutory duty to assist veterans in developing the evidence necessary to substantiate their claims." *Henderson*, 562 U.S. at 431–32; *see* 38 U.S.C. § 5103A(a)(1) ("The Secretary shall make reasonable efforts to assist a claimant in obtaining evidence necessary to substantiate the claimant's claim[.]");[8] 38 C.F.R. § 3.159(c) (articulating the VA's duty to assist as the "VA will make reasonable efforts to help a claimant obtain evidence necessary to substantiate the claim"). We have recognized that "Congress has explicitly defined the VA's duty to assist a veteran with the factual development of a benefit claim in terms of relevance." *McGee v. Peake*, 511 F.3d 1352, 1357 (Fed. Cir. 2008). Where the VA has breached this duty by omitting from the record documents within its control that could reasonably be expected to be part of the veteran's claim, the constructive possession doctrine provides a remedy.

---

8    While 38 U.S.C. § 5103A was enacted after *Bell*, *see* Veterans Claims Assistance Act of 2000, Pub. L. 106–475, 114 Stat. 2096 (2000) (enacting 38 U.S.C. § 5103A); *Bell*, 2 Vet. App. at 611 (issued July 21, 1992), the VA has had a "duty to assist" since the 1972 promulgation of 38 C.F.R. § 3.103(a), *see* 38 C.F.R. § 3.103(a) (1972) (providing for the "obligation of [the] VA to assist a claimant in developing the facts pertinent to the claim"); Due Process and Appellate Rights, 37 Fed. Reg. 14,780, 14,780–81 (July 25, 1972) (promulgating 38 C.F.R. § 3.103(a) (1972)).

The Veterans Court concluded that "[t]o hold" that the *NAS Update 2014* was "constructively part of the record before the Board" would "undermine the [Veterans] Court's jurisdictional obligation to base its review on the record of proceedings before the Board[.]" *Euzebio*, 31 Vet. App. at 402; *see id.* at 400 (citing *Kyhn v. Shinseki*, 716 F.3d 572, 576–78 (Fed. Cir. 2013) for the proposition that the Veterans Court "contravenes the jurisdictional requirements of [38 U.S.C. §] 7252(b) by considering extra[-]record evidence"). Similarly, the Government argues, for the first time on appeal, that "[t]he constructive possession doctrine is contrary to the clear meaning of 38 U.S.C. § 7252(b) because it construes 'the record of proceedings before the Secretary and Board' to include documents that were not before VA adjudicators[.]" Appellee's Br. 34; *see id.* at 34 n.15 (conceding this argument "was not presented to the Veterans Court"). Both are incorrect.

First, 38 U.S.C. § 7252(b) provides that "[r]eview in the [Veterans] Court shall be on the record of proceedings before the Secretary and the Board." Review on the administrative record, "the so-called 'record rule,'" is a common, well-established limitation placed on judicial review of agency decisions. *Home Prod.*, 633 F.3d at 1379 (citing, inter alia, *Fla. Power*, 470 U.S. at 743); *see, e.g.*, *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). The record rule, however, "is not without exceptions." *Home Prod.*, 633 F.3d at 1379. The record rule's "purpose . . . is to guard against courts using new evidence to convert the arbitrary and capricious standard into effectively de novo review"—not to "preclude[] effective judicial review" entirely. *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (internal quotation marks and citation omitted). Where, for example, the administrative record is "insufficient to permit meaningful judicial review," the reviewing court may consider

"extra-record evidence." *Id.* at 1381 (internal quotation marks and citation omitted); *cf.* 38 U.S.C. § 7111(a) (providing for the "[r]evision" of Board decisions based on "evidence" of "clear and unmistakable error"). Similarly, "a reviewing court is not precluded under [the record rule] from considering events [that] occurred between the date of an agency . . . decision and the date of decision on appeal." *Borlem S.A.-Empreedimentos Industriais v. United States*, 913 F.2d 933, 939 (Fed. Cir. 1990); *accord Home Prod.*, 633 F.3d at 1380; *cf.* 38 U.S.C. § 5108(a) (instructing the Secretary to "readjudicate [a supplemental] claim" where "new and relevant evidence is presented or secured").

In reviewing Board and VA determinations, the Veterans Court "decide[s] all relevant questions of law," 38 U.S.C. § 7261(a)(1), and "hold[s] unlawful and set[s] aside any [Board or VA] decisions" not in "accordance with law," *id.* § 7261(a)(3)(A). The Veterans Court must also review Board and VA determinations for "abuse of discretion" and "arbitrary [and] capricious" decision making, *id.*, including whether the Board or VA: "entirely failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); "applie[d] different standards to similarly situated [individuals] and fail[ed] to support this disparate treatment with a reasoned explanation and substantial evidence," *Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005); or, failed to "articulate a 'rational connection between the facts found and the choice made,'" *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Last, the Veterans Court may reverse "a finding of material fact adverse to the claimant . . . if the finding is clearly erroneous." 38 U.S.C. § 7261(a)(4); *see United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948) ("A finding is 'clearly erroneous' when although there is

evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.").

That is, while the Veterans Court must review Board and VA decisions on the "record of proceedings," 38 U.S.C. § 7252(b), that does not obviate its appellate role to, in fact, "review" those decisions, *Axiom*, 564 F.3d at 1380; *see Borlem*, 913 F.2d at 937 ("[D]eference does not require relinquishment of responsibility."). Where "the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the [Veterans] [C]ourt simply cannot evaluate the challenged agency action on the basis of the record before it," remand to the Board for "additional investigation or explanation" is appropriate. *Fla. Power*, 470 U.S. at 744; *see* 38 U.S.C. § 7252(a) (explaining that the Veterans Court has the "power to . . . reverse a decision of the Board or to remand the matter, as appropriate"). Congress created the Veterans Court for this express purpose. *See Barrett v. Nicholson*, 466 F.3d 1038, 1044 (Fed. Cir. 2006) ("[I]t was for the purpose of ensuring that veterans were treated fairly by the government and to see that all veterans entitled to benefits received them that Congress provided for judicial review through the Veterans' Judicial Review Act[.]").

Second, the Veterans Court misreads our decision in *Kyhn* as precluding all consideration of "extra[-]record evidence" in the course of its review of Board decisions. *Euzebio*, 31 Vet. App. at 400 (citing *Kyhn*, 716 F.3d at 576–78). In *Kyhn*, we explained the Veterans Court may not "rel[y] upon extra-record evidence to make a finding of fact in the first instance[.]" *Kyhn*, 716 F.3d at 578; *id.* at 575–78 (concluding that the Veterans Court had improperly considered affidavits proffered by the VA that had been created specifically for the record on appeal and were "evidentiary in nature" (citation omitted)). Indeed, "[i]n no event shall findings of fact made by the Secretary or the Board . . . be subject to trial de novo by the [Veterans]

Court." 38 U.S.C. § 7261(c); *see Andre v. Principi*, 301 F.3d 1354, 1362 (Fed. Cir. 2002) (explaining that 38 U.S.C. § 7261(c) "prohibits the Veterans Court from making factual findings in the first instance"); *Hensley v. West*, 212 F.3d 1255, 1263 (Fed. Cir. 2000) ("The statutory provisions are consistent with the general rule that appellate tribunals are not appropriate fora for initial fact finding."). This does not, however, preclude the Veterans Court from taking judicial notice of extra-record evidence that is "generally known" or "from sources whose accuracy cannot reasonably be questioned," *Kyhn*, 716 F.3d at 576 (quoting FED. R. EVID. 201), or in accordance with and in furtherance of its review of Board and VA decisions, *see* 38 U.S.C. § 7261 (providing the "[s]cope of review" of the Veterans Court over Board and VA decisions); *Home Prod.*, 633 F.3d at 1379, and, where appropriate, remanding to the VA "for additional investigation or explanation," *Fla. Power*, 470 U.S. at 744.[9]

The Government's other counterarguments are also unpersuasive. First, the Government argues that the

---

[9]    The Veterans Court similarly concluded that it "lack[ed] jurisdiction to consider" "documents that post-date the Board's decision, such as *The Purplebook . . .* to demonstrate that [the] VA and the Board were aware of the [*NAS Update 2014*.]" *Euzebio*, 31 Vet. App. at 402 n.3. This is incorrect. The Veterans Court may take judicial notice of agency manuals, such as *The Purplebook*, that post-date a decision by the Board. *See* FED. R. EVID. 201 (providing for "judicial notice of adjudicative facts" (capitalization normalized)); *Kyhn*, 716 F.3d at 576 n.5 (noting the applicability of FED. R. EVID. 201 to the Veterans Court); *Smith v. Derwinski*, 1 Vet. App. 235, 238 (1991) ("[The Veterans] Court[] may take judicial notice of facts not subject to reasonable dispute." (emphasis omitted) (citing FED. R. EVID. 201)).

Veterans Court's current "direct-relationship test" for constructive possession "is not inconsistent with [the applicable] statute[.]"    Appellant's Br. 43 (capitalization normalized).  The Government asserts that "direct relationship" and "relevance" are more or less the same standard.    *Id.* at 39 (arguing that the direct relationship "standard is akin to requiring that the document must be relevant to the claim at issue").  This is facially incorrect.  The "direct relationship" standard as articulated in *Euzebio* requires that the evidence be "specific to" the veteran.  *Euzebio*, 31 Vet. App. at 401; *see id.* (explaining that, under the direct relationship standard, "even if the document was generated for and received by [the] VA under a statutory mandate" such as NAS Reports, "[t]he document must bear a closer relationship to the [veteran] beyond providing general information related to the type of disability on appeal").  That is not a relevance standard.  Relevance requires that the document tend to prove or disprove a material fact.  *AZ*, 731 F.3d at 1311 (explaining that, to be "relevant," evidence "must tend to prove or disprove a material fact"); *cf.* FED. R. EVID. 401 (defining "[r]elevant [e]vidence" as "hav[ing] any tendency to make a fact more or less probable than it would be without the evidence" and that "fact is of consequence in determining the action").

Second, the Government argues that even if the Veterans Court were to conclude the Board had constructive possession of "relevant" evidence, the *NAS Update 2014* is not relevant to Mr. Euzebio's claim.  Appellant's Br. 43–44.  This argument is misplaced.  It asks us to apply law to facts—that is not our role here.  *See* 38 U.S.C. § 7292(d)(2); *see also Wanless v. Shinseki*, 618 F.3d 1333, 1336 (Fed. Cir. 2010) (explaining that "[a]bsent a constitutional issue . . . we lack the jurisdiction to 'review'" either "'a challenge to a factual determination, or . . . a challenge to a law or regulation as applied to the facts of a particular case'" (quoting 38 U.S.C. § 7292(d)(2))).  Whether, under the correct legal standard, the Board had constructive possession

of the *NAS Update 2014* is a question for the Veterans Court; whether the *NAS Update 2014* is sufficient to satisfy *McLendon* is a question for the Board. *Lang*, 971 F.3d at 1355; *see Fla. Power*, 470 U.S. at 744; *Deloach v. Shinseki*, 704 F.3d 1370, 1380 (Fed. Cir. 2013) ("[T]he evaluation and weighing of evidence are factual determinations committed to the discretion of the factfinder—in this case, the Board.").[10]

Third, the Government argues that "a reduced standard"—anything less than a direct relationship for

---

[10]    The Government similarly argues that, because the VA and Board were not "required" under statute or regulation to "consider[] NAS [R]eports when adjudicating individual claims," Appellee's Br. 26, we should "reject Mr. Euzebio's argument that NAS [R]eports were intended to be used in adjudicating individual claims," *id.* at 30; *see generally* 38 U.S.C. § 1116 (providing for the use of NAS Reports in creating "presumptions of service connection for diseases associated with exposure to certain herbicide agents," without reference to adjudication of individual claims). The Government's argument is, however, misdirected. Under the constructive possession doctrine, the issue is not whether 38 U.S.C. § 1116 or related regulations mandate the consideration of NAS Reports specifically as evidence in the adjudication of individual claims, but rather whether the NAS Reports are relevant evidence in the adjudication of individual claims. *Lang,* 971 F.3d at 1353–55; *Bell*, 2 Vet. App. at 612–13; *see* 38 U.S.C. §§ 5103A(a)(1) ("The Secretary shall make reasonable efforts to assist a claimant in obtaining evidence necessary to substantiate the claimant's claim for a benefit under a law administered by the Secretary."), 5107(b) (providing that the VA "shall consider all information and lay and medical evidence of record in a case before the Secretary with respect to benefits under laws administered by the Secretary").

constructive possession—is an "unworkable standard" that would "place an impossible burden on the [B]oard and the Secretary." Appellant's Br. 40. The Government warns that, if required to consider, for example, the NAS Reports for individual claimants, "[VA] [a]djudicators would be asked to evaluate and draw a conclusion on the impact that this aggregate characterization of evidence has on an individual case." *Id.* at 32. As an initial matter, it is unclear what the Government believes VA adjudicators are meant to do if not evaluate and draw conclusions from record evidence to discern its impact on individual cases. *See* 38 U.S.C. §§ 5107(b), 7104(a), 7252(b); 38 C.F.R. §§ 3.102, 3.159, 3.303. Indeed, contrary to the Government's argument, the VA already instructs its adjudicators to consider NAS Reports in some individual claims, even where the "VA has not conceded a relationship" between herbicide exposure and the claimed medical condition. J.A. 76; *see* J.A. 75–76 (*The Purplebook*) (explaining that "suggestive evidence of an association" between a medical condition and "exposure to herbicide agents" as discussed in NAS Reports may "be sufficient to establish an 'indication' that the current disability 'may be related' to herbicide agent exposure during service, as contemplated by 38 U.S.C. § 5103[A](d)(2)(b)," even if the VA has not "conceded a relationship"). Further, the Veterans Court already remands to the Board for consideration of NAS Reports in individual claims without presumptive service connection, both on the Secretary's concession and sua sponte. *See, e.g.*, *Rodriguez v. Wilkie*, No. 18-3991, 2019 WL 6120504, at *3 (Vet. App. Nov. 19, 2019) (noting that the "Secretary concede[d] [that] the Board failed to provide an adequate statement of reasons or bases for concluding that appellant's hypertension is not service connected," because, inter alia, "the Board failed to . . . analyze how the [*NAS Update 2012*] affects appellant's hypertension claim," then "accept[ing] the Secretary's concessions" and remanding "to address these deficiencies"); *Reas v. O'Rourke*, No. 17-1271, 2018 WL 3699968, at *3 (Vet. App. July 26, 2018) (taking judicial

notice of the *NAS Update 2014* to demonstrate that the "[VA medical] examiner's opinion [wa]s incomplete" and remanding); *Clark v. Shinseki*, No. 12-2667, 2013 WL 6729512, at *2 (Vet. App. Dec. 20, 2013) (concluding that, while the *NAS Update 2010* was not in the administrative record, "the language at issue [wa]s published in the Federal Register" and therefore "before the Board when the Board's decision was made," noting that the *NAS Update 2010* "may indicate an association between Agent Orange and hypertension, warranting an examination," and remanding to "the Board to consider this matter in the first instance"). This suggests that consideration of NAS Reports would not be "unworkable" or "impossible" for VA adjudicators.[11]

The Government's argument neglects that relevance and reasonableness are the pervasive, well-established standard that the VA is required to apply and has applied for decades. *See Lang*, 971 F.3d at 1353–55; *Bell*, 2 Vet. App. at 612–13; 38 C.F.R. § 20.1403(b)(2) (codifying the *Bell* rule for "Board decisions on legacy appeals" on claims

---

[11]    Further, the Government's corollary to its argument, that "[r]equiring [NAS Reports] to be discussed or to be the basis of an exam in all individual claims for a condition that has been evaluated in a[n] NAS report would . . . put VA adjudicators and examiners in an extremely challenging position," Appellee's Br. 32, conflates the constructive possession of evidence, *Lang*, 971 F.3d at 1353; *Bell*, 2 Vet. App. at 612, with the evaluation of that evidence, *see* 38 U.S.C. § 5103A(d)(2)(B); *McLendon*, 20 Vet. App. at 81. The constructive possession doctrine does not compel a specific result, only that the VA and the Board fulfill its statutory duty to gather and weigh all relevant evidence in reaching its determination. *See* 38 U.S.C. §§ 5107(b), 7104(a); 38 C.F.R. § 3.303; *see also Barrett*, 466 F.3d at 1044.

that pre-date *Bell* as providing that the Board has constructive possession of "relevant documents possessed by the [VA] . . . provided that the documents could reasonably be expected to be part of the record"); *see also Blount v. West*, 11 Vet. App. 32, 33 (1998) (considering "relevant" evidence under *Bell*); *Bowey v. West*, 11 Vet. App. 106, 109 (1998) (framing *Bell*'s requirement that the evidence be "reasonably expected to be a part of the record" as a question of whether it is "reasonable to expect the [VA] or the Board to have investigated, gathered, and considered" that evidence and rejecting evidence that was "too tenuous" to be relevant); *Simington v. Brown*, 9 Vet. App. 334, 335 (1996) (concluding that "the disputed items . . . are relevant and should be included in the [record] if they were in the Secretary's 'control' so as to charge him with either actual or constructive knowledge").

The Government's argument also ignores "the importance of systemic fairness and the appearance of fairness" "in the context of veterans' benefits," including in the development of all necessary evidence. *Hodge v. West*, 155 F.3d 1356, 1363 (Fed. Cir. 1998); *see* 38 U.S.C. § 5103A(a)(1); 38 C.F.R. § 3.159(c). The veterans' benefits system is "uniquely pro-claimant." *Sullivan v. McDonald*, 815 F.3d 786, 791 (Fed. Cir. 2016). It is "not meant to be a trap for the unwary, or a stratagem to deny compensation to a veteran who has a valid claim[.]" *Comer v. Peake*, 552 F.3d 1362, 1369 (Fed. Cir. 2009); *see Barrett*, 466 F.3d at 1044 ("The government's interest in veterans cases is not that it shall win, but rather that justice shall be done, that all veterans so entitled receive the benefits due to them."). Accordingly, in requiring a "direct relationship" between the *NAS Update 2014* and Mr. Euzebio's claim, rather than relevance to his claim, the Veterans Court applied a legally erroneous standard.

CONCLUSION

We have considered the Government's remaining arguments and find them unpersuasive.  The Judgment of the U.S. Court of Appeals for Veterans Claims is

**VACATED AND REMANDED**

COSTS

Costs to Mr. Euzebio.