# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 21-5284

PABLO R. MARTINEZ, APPELLANT,

V.

DENIS MCDONOUGH,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued February 28, 2023                                    Decided August 29, 2023)

*April Donahower*, with whom *Brittani L. Howell* and *Amy F. Odom* were on the brief, all of Providence, Rhode Island, for the appellant.

*James M. Carlson*, Appellate Attorney, with whom *Catherine C. Mitrano*, Acting General Counsel; *Mary Ann Flynn*, Chief Counsel; and *Megan C. Kral*, Deputy Chief Counsel, all of Washington, D.C., were on the brief for the appellee.

Before ALLEN, MEREDITH, and FALVEY, *Judges*.

FALVEY, *Judge*, filed the opinion of the Court. ALLEN, *Judge*, filed a dissenting opinion.

FALVEY, *Judge*: In *Hembree v. Wilkie*, we held that if a written withdrawal of an appeal under 38 C.F.R. § 20.204 complies with that regulation's requirements,[1] then it is effective immediately and "that is generally the end of the matter." 33 Vet.App. 1, 7 (2020). That said, we left open the question of "[w]hether any post-withdrawal information *could* call the propriety of

---

[1] The regulation for withdrawals before the Veterans Appeals Improvement and Modernization Act (AMA) was 38 C.F.R. § 20.204. After the AMA, 38 C.F.R. § 20.205 is now the regulation that applies to withdrawals in the AMA system and 38 C.F.R. § 19.55 is the regulation that applies to withdrawals in the legacy system. Here, Mr. Martinez's appeal for a total disability rating based on individual unemployability (TDIU) was under the legacy system. And, like the prior regulation, § 19.55 states that the withdrawal must include the veteran's name, the claim file number, and a statement that the appeal is withdrawn.

that withdrawal into question." *Id*. Today, we answer that question in the affirmative to the extent that the information could call into question the initial validity[2] of the withdrawal.[3]

In so doing, we reaffirm the basic principle that if a claimant makes an argument about the validity of the withdrawal, the Board needs to address that argument. And, because the Board also needs to consider issues reasonably raised by the record, it needs to address the validity of a withdrawal if the record reasonably raises that matter. But, given that the Board need not invent and reject every theory to produce a valid decision and that the regulation makes a valid withdrawal effective when received, only evidence that strikes at the very validity of a withdrawal must be considered and addressed.

In short, we hold that, if the claimant or the circumstances of the withdrawal reasonably raised a question about the withdrawal's validity, the Board must address the matter. And, once that issue is raised, 38 U.S.C. § 7104(a) requires the Board to review all evidence relevant to the claimed or apparent reason for the invalidity. Because the regulation makes a withdrawal effective when received, the Board's focus should be on evidence that could cast doubt on whether the withdrawal was valid at all. And, although we don't address all such situations, we have already held in *Hembree* that we may not rewrite the regulation to include an inquiry into the claimant's subjective understanding of the written withdrawal.

Applying our holding, we affirm the Board decision. The Board properly addressed and rejected Mr. Martinez's argument about the timing of his application for TDIU, which he claimed either clouded the validity of his withdrawal of another TDIU claim or was a request to rescind that withdrawal. And because neither he nor the record suggested that his cognitive impairment cast doubt on the validity of his withdrawal of his appeal, the Board did not have to explore that issue.

---

[2] As discussed below, by calling into question the "validity" of a withdrawal, we mean defects that could render the withdrawal void from the beginning, *see* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "void" as "[o]f no legal effect"), (defining "valid" as "[l]egally sufficient"), which does not include a subjective lack of understanding, *see* *Hembree*, 33 Vet.App. at 6-7.

[3] We also address whether the Board clearly erred in concluding that the appellant did not respond to VA's letter advising him to contact VA immediately if he did not intend to withdraw his TDIU appeal.

# I. BACKGROUND

## A. Facts and Procedural History

Army veteran Pablo R. Martinez, through counsel, appeals a May 20, 2021, Board of Veterans' Appeals decision denying an effective date before February 9, 2010, for TDIU.

Mr. Martinez had a 50% post-traumatic stress disorder (PTSD) rating effective April 2003. Record (R.) at 3938. In October 2006, he filed a claim for an increased PTSD rating, R. at 3929, which the regional office (RO) denied in May 2007, R. at 3835. In December 2007, he submitted a TDIU application. R. at 3826.

During a March 2008 VA examination, Mr. Martinez reported memory problems. R. at 3776. The examiner performed cognitive testing and stated that "[t]his pattern of scores wherein nonverbal reasoning performance is better than verbal reasoning performance is consistent with a decline in cognitive functioning that is greater than normal age-related changes." R. at 3777-78. The examiner concluded that there was insufficient data to support a particular diagnosis related to poor memory functioning, but noted that Mr. Martinez's memory functioning should be tested again after an appropriate period to measure any decline. R. at 3778 (also opining that his PTSD would not prevent him from being employable).

In September 2008, the RO continued the 50% PTSD rating but denied TDIU. R. at 3741-42. In August 2009, the veteran filed a Notice of Disagreement (NOD) with the TDIU denial and requested decision review officer (DRO) review with a hearing. R. at 3721. VA scheduled the DRO hearing for February 9, 2010. R. at 3719.

On the day of his scheduled hearing, Mr. Martinez, through a veterans service organization (VSO) representative, submitted a letter to VA stating: "Request to cancel/withdraw appeal and hearing for entitlement to [TDIU]." R. at 3715. That same day, again through the VSO representative, he also filed a claim for an increased PTSD rating. R. at 3713. The next day, VA sent Mr. Martinez a letter stating that it received his request to withdraw his pending appeal of the TDIU claim and would take no further action on that issue and informing him that, if he did not intend to withdraw his claim, he should contact VA immediately. R. at 3699.

Later that month, on February 25, 2010, during a PTSD examination, a VA examiner noted a cognitive disorder diagnosis and that the veteran's memory deficiencies would likely prevent him from working because he would be unable to remember and carry out simple instructions. R. at 3696-97.

Based on this examination, on March 16, 2010, the RO granted a 70% PTSD rating effective February 25, 2010. R. at 3667. The RO noted that Mr. Martinez now met the TDIU criteria under 38 C.F.R. § 4.16 but deferred the TDIU issue because it needed additional information. R. at 3676. In a March 22, 2010, letter accompanying the RO decision, VA informed the veteran that it needed additional information from him and asked him to complete VA Form 21-8940 (TDIU application). R. at 3655-56. On March 29, 2010, Mr. Martinez submitted the requested TDIU application, asking that VA obtain a March 26, 2010, record that supported his claim. R. at 3651-53.

In that medical record, Mr. Martinez reported that for the last year or so he had increased difficulty with thinking, processing information, and memory. R. at 1897. The provider noted that the combination of the veteran's memory concerns, PTSD, and depression significantly impacted daily activities. R. at 1898. After conducting a mental status examination, the provider stated that Mr. Martinez could read and comprehend things within normal limits and that he believed that the veteran was suffering from mild cognitive impairment. R. at 1900 (noting "[r]ule out early-onset dementia versus mild cognitive impairment"). An April 2010 medical record noted that Mr. Martinez's cognitive disorder, "which appeared to be a likely developing dementia" and not associated with PTSD, had caused unemployability. R. at 3576.

Years later, in July 2016, the RO granted (1) a 70% rating for PTSD with cognitive disorder from February 9, 2010; (2) service connection for a cognitive disorder, assigning a 100% rating from October 5, 2011; and (3) TDIU from February 9, 2010, to October 5, 2011. R. at 2916-17. The RO explained that the TDIU effective date reflected the date of receipt of his claim for an increased PTSD rating and that the TDIU end date reflected the effective date of the 100% PTSD rating. R. at 2920.

In July 2017, Mr. Martinez, now represented, filed an NOD as to the TDIU effective date. R. at 2851. The veteran's attorney, who is a member of the same law firm that now represents him before the Court, submitted a letter arguing that (1) on February 10, 2010, VA informed Mr. Martinez that it had accepted his withdrawal of the TDIU appeal and that "'[i]f this was not your intent, you should contact us immediately'"; (2) that, on March 29, 2010, the veteran submitted a TDIU application; and (3) that, because VA never specified a time frame in which he should respond to the February 2010 notice, VA should accept the March 2010 submission as a request to rescind the withdrawal. R. at 2853 (quoting R. at 3699); *see id.* (not mentioning that the veteran

did not understand the consequences of the withdrawal or that he had cognitive impairment when he filed the withdrawal).

The RO then issued a Statement of the Case (SOC) continuing the effective date period for TDIU. R. at 2822. In January 2019, Mr. Martinez perfected his appeal to the Board and his attorney reiterated the argument that the March 2010 TDIU application submission responded to the February 2010 VA letter about the withdrawal. R. at 2803, 2806 (again not mentioning that the veteran did not understand the consequences of the withdrawal or that he had cognitive impairment when he filed the withdrawal).

In June 2020, the Board denied an earlier TDIU effective date. *See* R. at 27. Mr. Martinez appealed and this Court then granted the parties' December 2020 joint motion for remand, which stated that the Board erred by issuing its decision before allowing the veteran the full 90-day period that he had requested to submit additional argument and evidence. *Id*.

Back before the Board, in March 2021, Mr. Martinez's attorney again argued that the March 2010 TDIU application submission responded to the February 2010 VA letter and thus the veteran had not withdrawn the TDIU appeal. R. at 28-29 (asserting that "[t]he Board failed to explain its determination that the [v]eteran unambiguously withdrew his appeal with a full understanding of the consequences of his actions in February 2010, especially in light of his March 2010 filing").

## B. The Board Decision

In the May 2021 decision on appeal, the Board again denied an earlier effective date for TDIU. R. at 5. The Board found that Mr. Martinez's February 9, 2010, written withdrawal of the TDIU appeal was valid because it contained his name and claim file number and unambiguously identified TDIU as the matter being withdrawn. R. at 10. The Board thus stated that, under *Hembree*, it did not have to inquire into Mr. Martinez's subjective understanding of the withdrawal and its consequences. R. at 11 (finding irrelevant the evidence the veteran cited to support his argument that the withdrawal was invalid). The Board also stated that, even if it were to inquire into his subjective understanding of the withdrawal, there was no evidence other than post hoc rationalizations raised 9 years after the written withdrawal was submitted. R. at 12. The Board determined that the March 2010 TDIU application was not evidence that Mr. Martinez wished to continue his prior appeal. R. at 12 (noting that Mr. Martinez did not mention the withdrawal in the March 2010 TDIU application). Instead, the TDIU application responded to the RO's prompt for him to submit it in a new claim (for an increased PTSD rating). *Id*.

5

C. The Court's Single-Judge Decision and Reconsideration

Mr. Martinez again appealed to this Court and, on October 24, 2022, the Court issued a single-judge decision affirming the Board decision. On November 14, 2022, Mr. Martinez moved for single-judge reconsideration or, in the alternative, for a panel decision. On November 18, 2022, the Court granted single-judge reconsideration because the single judge, sua sponte, determined that a panel was necessary; dismissed as moot the motion for panel review; withdrew the October 24, 2022, single-judge decision; and ordered the Clerk of the Court to issue an order submitting the case to panel. The Court noted that the panel issue concerned the interplay between section 7104(a) (a Board decision must be based on all evidence of record) and the Court's interpretation of § 19.55 (withdrawal of an appeal) in *Hembree*. On November 23, 2022, the Clerk issued an order submitting the case to panel.

D. Additional Responses

On November 28, 2022, the panel ordered the Secretary to respond to Mr. Martinez's motion for reconsideration and allowed Mr. Martinez to reply to the Secretary's response.

In his December 19, 2022, response, the Secretary asserts that Mr. Martinez did not raise a potential conflict between section 7104 and § 19.55 in his opening brief. Secretary's Dec. Resp. at 1. He then argues that the veteran has not shown that § 19.55 conflicts with the Board's obligation under section 7104. *Id*. at 2. The Secretary contends that section 7104 does not address the evidence that the Board must consider about a withdrawal, but provides a general instruction and that § 19.55 explains what specific evidence is relevant when addressing the validity of a written withdrawal. *Id*. He argues that § 19.55 does not change the Board's obligation to consider the entire record under section 7104; instead, the regulation directs the Board to the kind of evidence that it must address when evaluating a withdrawal's validity. *Id*. at 3. He reasons that, because section 7104 does not address the requirements for a written withdrawal and § 19.55 does not instruct VA adjudicators to ignore evidence, these provisions are in harmony. *Id*.

The Secretary also contends that, even if there were some facially plausible inconsistency, it is a longstanding principle of regulatory interpretation that courts should interpret regulations consistent with the statutes they implement. *Id*. (citing *Barry v. McDonough*, 35 Vet.App. 111, 123 (2022)). He notes that § 19.55 implements section 7105(b) (NOD requirements, including an instruction that the Secretary develop a policy to permit claimants to modify information identified in the NOD after its filed) and section 7105(d) (the Board may dismiss any appeal that fails to

identify the specific determination with which the claimant disagrees). *Id*. at 3-4. The Secretary asserts that there is no indication, nor does Mr. Martinez argue, that § 19.55 improperly implemented section 7105(b). *Id*. at 4.

The Secretary then argues that the Board must only discuss theories that were reasonably raised by the claimant or the record, and that neither the record nor Mr. Martinez raised the argument that the withdrawal resulted from cognitive impairment, rather than it being a deliberate strategic choice to pursue an increased PTSD rating instead of TDIU. *Id*. at 4-5 (noting that Mr. Martinez even now merely asserts that cognitive impairment *might* have affected his ability to understand the consequences of the withdrawal).

In his January 3, 2023, reply, Mr. Martinez asserts that § 19.55 operates similarly to the presumption of examiner competency: (1) an examiner is presumed competent until a claimant challenges the competency before the Board and then the Board must make a factual finding about the examiner's qualifications, and (2) a facially valid written withdrawal is effective once received but, once a question of the validity of the withdrawal is raised to the Board, the Board must make factual findings about the validity based on all the evidence. Appellant's Jan. Reply at 3. He also argues that § 19.55 only identifies what constitutes a facially valid written withdrawal; but, once the validity is challenged, the Board must base its determination on all the evidence. *Id*. at 4 (asserting that § 19.55 does not specify what VA is to do after a challenge is made).

He then reiterates the argument that his citation to cognitive impairment evidence is not a new theory but is support for an already raised issue. *Id*. at 5-6. He also contends that, contrary to the Secretary's argument, in his brief, he cited evidence that cognitive impairment affected his ability to understand the consequences of his withdrawal, such as records showing difficulty with thinking and processing information. *Id*. at 7-8 (noting that, at any rate, whether his cognitive disorder impacted his understanding was a factual question for the Board to address).

## II. ANALYSIS

### A. Addressing the Validity of a Written Withdrawal

We begin our analysis with the standards for withdrawing an appeal. We have a well-settled standard for orally withdrawing an appeal: the withdrawal is effective only where it is "explicit, unambiguous, and done with full understanding of the consequences of such action on the part of the claimant." *DeLisio v. Shinseki*, 25 Vet.App. 45, 57 (2011).

7

Recently, in *Hembree*, we held that this standard does not apply to a written withdrawal. There, the veteran argued that the Board erred in finding that he withdrew his appeal because it failed to discuss the *DeLisio* requirements. 33 Vet.App. at 4. But the Court determined that, "unlike *DeLisio*, the regulation [concerning written withdrawals] does not leave room for us to read into it a requirement for an affirmative inquiry into whether the withdrawal is done with full understanding." *Id*. at 5. We thus concluded that "forcing an inquiry into the veteran's subjective understanding following the written withdrawal would impermissibly negate the[] provisions of the regulation, something we may not do." *Id*. at 6. Even so, we noted that "[w]hether any post-withdrawal information could call the propriety of that withdrawal into question is not an issue we need to address today." *Id*. at 7 (emphasis omitted).

We called this case to panel to address the question that *Hembree* left open: what, if any, situations would reasonably raise the validity of an unambiguous withdrawal—that is, when the § 19.55 requirements are met—such that the Board would be required to look beyond the four corners of that document. As part of this, we must also consider whether there are limits to the evidence that the Board must review when dealing with the validity of a written withdrawal.[4]

Our inquiry on this second point proves rather short because there is little daylight between the parties; they agree that under section 7104(a), the Board's review of a withdrawal turns on the entire record. But deciding when the Board must address the validity of a withdrawal is more complicated. True, it is easy to say that, as with all issues, the Board must address the validity of a withdrawal when the matter is raised by the claimant or the record; this is a basic rule of veterans law. *Robinson v. Peake*, 21 Vet.App. 545, 552-53 (2008), *aff'd sub nom. Robinson v. Shinseki*, 557 F.3d 1355 (Fed. Cir. 2009).

But what does that really mean here? Is the Board required to look beyond the four corners of an unambiguous written withdrawal only if something suggests that the withdrawal was invalid from the start? Or is it that the Board must look beyond those four corners any time there is an indication that the veteran did not have a full understanding of the consequences of withdrawing a claim?

---

[4] Although we ultimately conclude that the record did not reasonably raise the issue of whether Mr. Martinez lacked the mental capacity to legally withdraw his TDIU claim, we couldn't decide that without first considering whether the Board is ever required to look beyond the four corners of an unambiguous written withdrawal and, if so, what evidence would generally be relevant to that inquiry.

To answer these questions, we start with the regulation. Both the previous and present versions of the withdrawal regulations provide that a withdrawal is effective when received. 38 C.F.R. §§ 19.55(b)(3), 20.204(b)(3). This means that, for a withdrawal not to be immediately effective, the evidence must show that the withdrawal was invalid or void when VA received it.

Mr. Martinez's argument relies on the idea that the withdrawal must be done with full understanding of the consequences and that the Board must confirm that understanding. But, as stated, we rejected such a requirement for written withdrawals in *Hembree*. 33 Vet.App. at 5-6 (noting that the specificity requirements for a written withdrawal and the ability to renew an appeal act to protect the veteran's interest in the claim much like *DeLisio*'s "understanding" requirement). Nothing has changed since *Hembree* that would call our earlier holding into question. The text of the previous and present versions of the withdrawal regulations is the same. And so are the practical difficulties of trying to determine a veteran's understanding without a hearing. *Id*. at 6 (explaining that, other than in the hearing context, "requiring VA to make an affirmative inquiry when the claimant or a representative submits an otherwise explicit and unambiguous written withdrawal imposes a heavier burden").[5]

Thus, rather than trying to retrospectively suss out whether the veteran *fully understood* the consequences of an unambiguous written withdrawal, the focus should be on whether the record reasonably suggests any issues that could have prevented the withdrawal from being valid in the first place.[6] Without a more robust argument from Mr. Martinez, which does more than essentially resurrect the *Hembree* understanding issue, we need not delve into the full extent of what sort of situations would require the Board to explore whether an unambiguous written withdrawal was invalid from the beginning.

---

[5] And we note that, like *Hembree*, 33 Vet.App. at 5, n.4, Mr. Martinez did not challenge the regulation itself. Thus, we leave any such questions for another day.

[6] As in *Hembree*, we note that, if a veteran made a mistake in withdrawing his or her appeal, the regulation provides a solution. *See Hembree*, 33 Vet.App. at 6 (stating that "the fact that the appellant can renew the appeal after withdrawing it shows us that the regulation contemplates the appellant changing his or her mind or undoing the withdrawal if it is submitted by mistake or if there is a change in circumstances"); 38 C.F.R. § 19.55 ("Withdrawal does not preclude filing a new Notice of Disagreement and . . . a new Substantive Appeal, as to any issue withdrawn, provided such filings would be timely under these rules if the appeal withdrawn had never been filed"). And it appears that in some cases, as in Mr. Martinez's, VA sends letters to veterans to let them know they can effectively undo their withdrawal. R. at 3699. In any case, if a mistake occurs, we would expect a communication from a veteran suggesting that a mistake had been made.

For now, we see no reason to go beyond noting the well-settled rule "that one is not relieved from the consequences of a written election absent a showing that mental incompetence, duress or fraud is the reason for an election one later seeks to void." *Collins v. Off. of Pers. Mgmt.*, 45 F.3d 1569, 1573, 1572-73 (Fed. Cir. 1995) (rejecting appellant's argument that "he made a mistake in signing a form [and] 'that [he] didn't understand the consequences'"). Thus, the Board's attention should focus on evidence suggesting these or similar events that would have prevented the withdrawal from becoming valid in the first place. This means that, besides ensuring that the withdrawal meets the regulatory requirements of §19.55 or § 20.205, the Board should address evidence reflecting issues that would ordinarily excuse a voluntary decision—mental incompetence, duress, or fraud. *Id*. That way, even if submitted, the withdrawal was not effective and there is no concern that we are "impermissibly negat[ing] . . . the regulation, something we may not do." *Hembree*, 33 Vet.App. at 6.

With this in mind, we repeat that VA must address all issues expressly raised by the claimant or reasonably raised by the record. *Robinson*, 21 Vet.App. at 553. Thus, if a veteran argues that his or her withdrawal was invalid, the Board needs to address that argument and consider all the evidence relevant to the claimed reason for the invalidity. And the Board must also address that issue if evidence reasonably calls the validity of the withdrawal into question. *Id*.

To be clear, we are not saying that the Board must sally forth to ferret out the veteran's subjective understanding following a written withdrawal; we rejected that in *Hembree* and do so again here. *See Hembree*, 33 Vet.App. at 6. Nor are we requiring the Board to review voluminous records to try to determine whether anything possibly suggested a misunderstanding about an unambiguous written withdrawal. *See Robinson*, 21 Vet.App. at 553. Rather, if evidence reasonably suggests that the withdrawal was void from the beginning—for example, evidence suggesting the veteran lacked mental capacity to make decisions around the time of the withdrawal—then the Board would have to address that evidence. *Id*.

And this brings us back to the relatively easy question, what evidence must the Board review in assessing the validity of a withdrawal? Like most other areas concerning VA benefits, the answer is found in the statute. Under section 7104(a), the Board's review is based on the entire

10

record.[7] And if the veteran raised an issue with the withdrawal's validity, the Board must consider all evidence related to the claimed reason for the invalidity. And if the record reasonably raised an issue with the withdrawal's validity, then the Board must address that evidence.

To recap, a claim is withdrawn when the unambiguous written withdrawal is received. And so, VA does not ordinarily need to look beyond that to find a claim withdrawn. But when there is evidence suggesting that the withdrawal was never valid in the first place—such as because the veteran lacked the capacity to withdraw a claim—the Board would need to consider that evidence. And, of course, if the veteran argues as much, the Board must address those arguments and any related evidence. With these considerations in mind, we turn to Mr. Martinez's case.

## B. Application to Mr. Martinez

### 1. The Board Addressed Mr. Martinez's Argument about his TDIU Application

Mr. Martinez's February 9, 2010, written withdrawal was unambiguous and met the § 19.55 requirements (name, file number, and a statement that the appeal is withdrawn). As the Board noted, the withdrawal contained Mr. Martinez's name and claim file number and unambiguously stated that he was withdrawing his TDIU appeal. R. at 10-11, 3715 ("Request to cancel/withdraw appeal and hearing for entitlement to [TDIU].").

Before VA, Mr. Martinez argued that his March 29, 2010, TDIU application—filed more than 6 weeks after the February 10, 2010, VA letter instructing him to respond immediately if withdrawal was not his intent—"suggests" that he did not make the withdrawal with full knowledge and understanding of its consequences and was an implied request to rescind that withdrawal. Appellant's Brief (Br.) at 11; *see* R. at 28-29, 2803-06, 2851-53. As for the former contention, *Hembree* held, and the Board correctly concluded, that an inquiry into the appellant's subjective understanding is not required when there is an unambiguous written withdrawal. However, because Mr. Martinez also raised the issue of whether he tried to rescind the withdrawal, the Board had to address that question. And as required, the Board did so.

Recall that the Board determined that the March 29, 2010, TDIU application was not evidence that Mr. Martinez wished to continue his prior appeal, but was instead a response to the RO's March 22, 2010, prompt for him to submit the TDIU application during a new claim,

---

[7] True, the record may be limited in the AMA system given the veteran's choice of appellate lanes, *see Andrews v. McDonough*, 34 Vet.App. 151, 156-57 (2021), but such limits come from statutes and regulations governing appellate lanes under the AMA and are not based on the fact that the question involves withdrawal of a claim.

particularly given that Mr. Martinez did not mention the withdrawal in the TDIU application. R. at 12.

The Court finds that there is a plausible basis for the Board's determination about the March 2010 TDIU application. *See Gilbert v. Derwinski*, 1 Vet.App. 49, 53 (1990) (holding that "this Court is not permitted to substitute its judgment for that of the [Board] on issues of material fact; if there is a plausible basis in the record for the factual determinations of the [Board], the Court cannot overturn them").

Consider the series of events. On February 9, 2010, Mr. Martinez submitted a written withdrawal of his TDIU appeal. R. at 3715. That same day, he also filed an increased PTSD rating claim. R. at 3713. The next day, VA informed him that it received his TDIU appeal withdrawal, that it would take no further action on that issue, and that, if withdrawal was not his intent, he should contact VA immediately. R. at 3699. Mr. Martinez didn't contact VA about his withdrawal.

Over a month later, the RO granted a 70% PTSD rating and noted that Mr. Martinez now met the schedular TDIU criteria but deferred the matter to obtain evidence. R. at 3667, 3676. And, in the March 22, 2010, letter accompanying the RO decision, VA asked Mr. Martinez to complete a TDIU application. R. at 3655-56. As requested, on March 29, 2010, Mr. Martinez submitted a TDIU application; in it, he did not mention the February 9, 2010, withdrawal or claim that the withdrawal was invalid or unintentional. R. at 3651-53.

In other words, Mr. Martinez did not respond to the February 10, 2010, letter informing him to contact VA *immediately* if it was not his intent to withdraw his TDIU appeal, but he did respond promptly to the March 22, 2010, letter asking him to complete a TDIU application related to his new increased PTSD rating claim. And again, when he did so, he said nothing about the withdrawal being invalid or unintentional. That's the way the Board saw it, and we agree with this reading of the evidence. Thus, the Board's determination is plausible, and the Court will not overturn it. *See Gilbert*, 1 Vet.App. at 53.

We also note that, although not dispositive, the chronology of Mr. Martinez's TDIU eligibility seems to reinforce the Board's findings and gives context to what happened here. VA awards schedular TDIU when a veteran cannot secure or follow a substantially gainful occupation because of service-connected disabilities and meets certain numeric evaluation requirements: if there is one disability, it must be rated at 60% or more, and if there are two or more disabilities, at least one has to be rated at 40% or more, with "sufficient additional disability to bring the combined

rating to 70[%] or more." 38 C.F.R. § 4.16(a) (2023). Although a higher bar, extraschedular TDIU may also be possible when the veteran does not meet these percentage requirements. 38 C.F.R. § 4.16(b).

When Mr. Martinez withdrew his TDIU appeal, he had a 50% PTSD rating and a 20% diabetes rating, and his combined rating was 60%. *See* R. at 3741-45. Thus, Mr. Martinez did not meet the schedular requirements for TDIU before February 2010 and could only be granted TDIU on an extraschedular basis for that period. *See* § 4.16(a)-(b); *see also* R. at 3741-45 (in September 2008, the RO denied TDIU because the veteran was unemployable due to non-service-connected lumbar spine surgery complications and because he did not meet the numeric criteria).

It is only once the RO granted a 70% PTSD rating effective February 2010 that he met the numeric TDIU criteria from that date. But it is unclear how the February 2010 TDIU claim, which was part and parcel of the new higher PTSD rating claim and whose award was based on *schedular* rating criteria, could support awarding *extraschedular* TDIU before February 2010. *See* § 4.16(a)-(b); *see also Rice v. Shinseki*, 22 Vet.App. 447, 453-54 (2009).

In other words, VA asking Mr. Martinez in March 2010 to submit a TDIU application seems to have been to initiate the adjudication of TDIU *from* February 2010, after he met the *schedular* TDIU requirements with his 70% PTSD rating; it does not appear to concern whether he was entitled to *extraschedular* TDIU *before* February 2010. And this observation regarding Mr. Martinez's TDIU eligibility helps to provide more context for the Board's conclusion that the March 2010 schedular TDIU application was unrelated to the earlier (withdrawn) extraschedular TDIU claim.[8] *See Gilbert*, 1 Vet.App. at 53.

---

[8] During oral argument, Mr. Martinez asserted that he took contradictory actions on the same day—withdrawing his TDIU claim and filing a claim for a higher PTSD rating that included TDIU—and that this raised the issue that his cognitive impairment affected his understanding of the withdrawal's consequences. *See* Oral Argument at 19:36-40. But, as laid out above, these actions are not necessarily contradictory and can seemingly be reconciled. Perhaps Mr. Martinez's VSO representative advised him that he did not meet the extraschedular TDIU requirements before February 2010 and should thus withdraw that claim, but that he could meet the requirements for a higher PTSD rating from February 2010 (and then also the schedular TDIU requirements from that date) and should thus file a new claim for a higher PTSD rating. Even so, we need not speculate about why Mr. Martinez took the actions he did, particularly given that this argument comes far too late to merit serious consideration. *See Pieczenik v. Dyax Corp.*, 265 F.3d 1329, 1332-33 (Fed. Cir. 2001) (finding that "[i]t is well settled that an appellant is not permitted to make new arguments that it did not make in its opening brief" and not addressing arguments presented for the first time at oral argument).

To be clear, we are not affirming the Board's determination about the timing of the TDIU application based on our reasoning of when Mr. Martinez was eligible for extraschedular and schedular TDIU, or the possible advice that his representative provided him. *Cf. Calcutt v. Fed. Deposit Ins. Corp.*, 143 S. Ct. 1317, 1321 (2023) ("For if the grounds propounded by the agency for its decision 'are inadequate or improper, the court is powerless to affirm the

13

In sum, we conclude that the Board properly addressed the timing argument—that is, the treatment of the March 2010 TDIU application—that Mr. Martinez raised before VA.

### 2. *Mr. Martinez Did Not Expressly Raise a Validity Argument about his Cognitive Impairment*

Mr. Martinez argues that he also brought up cognitive impairment to the Board. We disagree. Even as he raised the issue discussed above, he did not argue that his cognitive impairment affected his February 2010 withdrawal.

In his July 2017 NOD, Mr. Martinez—with help from his current law firm—argued that, because the February 10, 2010, VA letter never specified a time frame in which he should respond, VA must accept the March 29, 2010, TDIU submission as a request to rescind the withdrawal. Mr. Martinez did not even mention that he did not understand the consequences of the withdrawal—an issue he focused much of his appeal on before this Court. More to the point, he said nothing to even suggest that he had cognitive impairment when he filed the withdrawal or that this impacted his withdrawal. R. at 2851-53.

Then, in January 2019, Mr. Martinez doubled down on his argument that the March 29, 2010, TDIU application submission responded to the February 10, 2010, VA letter; but again, he did not mention that he did not understand the consequences of the withdrawal or that he had cognitive impairment when he filed the withdrawal. R. at 2803-06.

And in March 2021, during his second trip to the Board, Mr. Martinez argued: "The Board failed to explain its determination that the [v]eteran unambiguously withdrew his appeal with a full understanding of the consequences of his actions in February 2010, especially in light of his March 2010 filing." R. at 29. But, even here, he did not mention cognitive impairment in this section of the response.[9]

---

administrative action by substituting what it considers to be a more adequate or proper basis.'" (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). We are affirming the Board's determination—based on the Board's own analysis—because there is a plausible basis in the record. This includes the VA letter informing Mr. Martinez that it received his TDIU appeal withdrawal and that, if withdrawal was not his intent, he should contact VA immediately; the veteran's failure to contact VA about his withdrawal; the RO's decision a month later granting a 70% PTSD rating, noting that Mr. Martinez now met the TDIU criteria, and deferring the matter to obtain evidence; the accompanying VA letter asking him to complete a TDIU application and Mr. Martinez submitting a TDIU application about a week later that did not mention that the withdrawal was a mistake. We provide this additional observation about Mr. Martinez's eligibility for TDIU on different bases during different periods because it reinforces our conclusion that the Board's determination had a plausible basis in the record.

[9] The Court notes that in the March 2021 response to the Board's 90-day letter, in a section separate from his withdrawal validity argument, Mr. Martinez brought up that the Board had otherwise erred in its denial of TDIU before February 2010 because, among other things, he reported (1) in a February 2010 examination that his worsening PTSD

14

Of Mr. Martinez's three pleadings to the Board on the withdrawal's validity, only one mentions that he may have made the withdrawal without a full understanding of the consequences, but that pleading, like the other two, focuses only on the timing of the March 2010 TDIU application. None allege that cognitive impairment affected his understanding of the withdrawal's consequences. Thus, despite Mr. Martinez's assertions to the contrary, his reference to cognitive impairment evidence here is a new theory and not support for an issue already raised to the Board (that is, not understanding the consequences of his withdrawal). Appellant's Jan. Reply at 5-6.[10]

Mr. Martinez had many opportunities, including while represented by highly competent counsel, to argue to VA that his cognitive impairment impacted his withdrawal. It is hard to comprehend how this argument, if apparent from the evidence and potentially meritorious, was not brought before VA sooner. *See Hembree*, 33 Vet.App. at 8 (quoting *Robinson*, 21 Vet.App. at 553, and finding that the Court does "not require the Board to assume the impossible task of inventing and rejecting every conceivable argument in order to produce a valid decision").

### 3. The Record Did Not Reasonably Raise the Cognitive Impairment Argument

To be sure, just because Mr. Martinez did not expressly raise the issue does not mean that the Board did not have to consider it. True, we may wonder why, despite being represented by the same law firm for years, Mr. Martinez never mentioned to VA that his cognitive impairment affected his withdrawal. But, ultimately, if that question was reasonably raised by the record, the Board had to address the matter. *See Robinson*, 21 Vet.App. at 553.

To this end, Mr. Martinez argues that the record reasonably raised the issue of whether he *knowingly withdrew* his TDIU appeal with *a full understanding* of the withdrawal's consequences. Appellant's Br. at 6-21. But, as explained above, and as the appellant accepts, *see id.* at 6, 10, for written withdrawals we do not require the Board to affirmatively engage in an assessment of the

---

symptoms included poor concentration, and (2) in March 2010 that over the past year his PTSD symptoms had gotten worse and that he experienced increasing difficulty with thinking and processing information. R. at 29-31. Mr. Martinez does not argue before the Court that this raised the issue that his cognitive impairment affected his competence to withdraw his appeal or full understanding of the withdrawal's consequences. Thus, we won't explore this further. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (finding that our system "is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief") (internal quotations omitted).

[10] We note that, under *Hembree*, the *DeLisio* "full understanding of the consequences" of the withdrawal language does not apply to written withdrawals; but our analysis here still touches upon that language because Mr. Martinez's argument is that the cognitive impairment evidence was support for the already raised issue that he did not fully understand the consequences of his February 2010 withdrawal. That said, the Board need not consider his understanding and, as we explain, the separate issue of whether his cognitive impairment made the withdrawal invalid.

veteran's subjective understanding of the consequences of that withdrawal, *Hembree*, 33 Vet.App. at 6 (explaining that, although it makes sense in the hearing context, requiring VA to affirmatively inquire into the veteran's subjective understanding imposes a heavier burden, as well as noting that the requirements for specificity for a written withdrawal and the ability to renew an appeal act to protect the veteran's interests in the claim much like *DeLisio*'s "understanding" requirement). But that is not the end of the matter.

Mr. Martinez also asserts that there was evidence suggesting that, at the time of the withdrawal, he had cognitive issues that the Board needed to consider. He relies on the fact that just weeks after the withdrawal he reasserted his entitlement to TDIU. Appellant's Br. at 17. He contends that, although the Board had no affirmative duty to inquire into his subjective understanding, the record raised the possibility that he did not fully understand the withdrawal's consequences. Thus, he reasons that the Board was obligated under section 7104(a) to consider that evidence. *Id*. Putting aside Mr. Martinez's continued reliance on *DeLisio*'s "understanding" language, we agree that, if there was evidence suggesting that the veteran had cognitive impairment that rendered the withdrawal invalid from the beginning, e.g., evidence that he was mentally incompetent, *see Collins*, 45 F.3d at 1572-73, then that would be something that the Board had to address. But we stress, the focus is on whether there were circumstances that would render the withdrawal void from the outset—such as a veteran's lack of capacity to withdraw the claim—and not on whether he or she had full subjective understanding of the consequences of withdrawing a claim.

The problem for Mr. Martinez is that there is no such evidence here. In fact, Mr. Martinez acknowledged during oral argument that there is nothing in the record itself that suggests that he did not understand the consequences of the withdrawal because of his cognitive impairment. *See* Oral Argument at 19:45-55;[11] *see also* Appellant's Br. at 1, 10-13, 16, 20 (asserting that the record contains evidence simply "suggesting," but not showing, that he did not have full understanding). Nor does he point us to evidence suggesting that the withdrawal was void from the outset due to his cognitive impairment.

---

[11] We again note that we reference *DeLisio*'s "understanding" language because Mr. Martinez's argument focused on that language. And it is reasonable to presume that if the veteran agrees that there was nothing in the record that stated that, because of his cognitive impairment, he did not understand the consequences of the withdrawal, he would also agree that there was nothing in the record stating that, for example, his cognitive impairment rendered him legally incapable of withdrawing his appeal.

In the end, Mr. Martinez can't point to anything that would have clued the Board in on the theory that, because of his cognitive impairment, he lacked the capacity to withdraw the appeal. Thus, although there was some evidence of cognitive impairment around the time that Mr. Martinez withdrew his TDIU appeal, *see* R. at 1897, 3696-97, the Board did not have to address this evidence; as Mr. Martinez recognizes, the record did not suggest that his mild cognitive impairment impacted his withdrawal.

In sum, neither Mr. Martinez nor the record raised a question about whether his cognitive impairment impacted his withdrawal. Thus, we see no error with the Board not addressing the issue.

### 4. The Board Considered Mr. Martinez's Invalidity Argument Even If It Misstated Hembree

The Court acknowledges Mr. Martinez's argument that *Hembree* did not hold that the Board *never* has a duty to consider post-withdrawal evidence when the written withdrawal is facially unambiguous, Appellant's Br. at 9-12, despite the Board's apparent reading of that case, *see* R. at 11-12 ("All such evidence proffered by the [v]eteran . . . relates only to an asserted lack of understanding. . . . [T]he Court in *Hembree* explicitly found that the Board is not required to [consider] that with an explicit and unambiguous written withdrawal."). Mr. Martinez is correct; in *Hembree* we concluded that "[w]hether any post-withdrawal information could call the propriety of that withdrawal into question is not an issue we need to address today." 33 Vet.App. at 7 (emphasis omitted). But this argument also doesn't get him far.

As the Board noted, R. at 11, the timing of the March 2010 TDIU application at best seems to relate to an asserted lack of understanding. But, as stated, *Hembree* found that "the regulation [concerning written withdrawals] does not leave room for us to read into it a requirement for an affirmative inquiry into whether the withdrawal is done with full understanding." 33 Vet.App. at 5; *see id.* at 6 (noting that the specificity requirements for a written withdrawal and the ability to renew an appeal act to the protect the veteran's interest in the claim much like *DeLisio*'s "understanding" requirement). Thus, the Board didn't have to consider Mr. Martinez's subjective understanding of the consequences of his written withdrawal.

And, as far as the timing of the March 2010 TDIU application could be coupled with evidence of cognitive impairment to suggest more than a mere misunderstanding, we have already found that this was not reasonably raised. Thus, it is hard to consider any error the Board committed prejudicial. *See* 38 U.S.C. § 7261(b)(2) (requiring the Court to "take due account of the

rule of prejudicial error"); *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (holding that the harmless-error analysis applies to the Court's review of Board decisions and that the burden is on the appellant to show that he or she suffered prejudice as a result of VA error).

More to the point, even if the Board overstated our holding from *Hembree*, it still considered Mr. Martinez's argument about the March 2010 TDIU application and evidence relevant to that argument. *See* R. at 12 ("Even if the Board were to inquire into the [v]eteran's subjective understanding of his written withdrawal . . . . [t]he March 2010 claim is simply not evidence that the [v]eteran wanted his prior appeal to continue . . . [;] there is no evidence that he filed the new claim for any reason other than that [VA] prompted him to do it *during the course of a new claim*."). And Mr. Martinez can't point us to evidence that the Board did not address that would call the validity of his withdrawal into question. True, the Board did not delve into whether he had cognitive impairment that impacted his withdrawal, but, as we already explained, the Board didn't have to do that because the issue wasn't raised by the veteran or the record.

That said, we stress that neither our decision today nor *Hembree* holds that the Board *never* has to look beyond the four corners of the written withdrawal. Instead, we hold that, if the evidence suggests that the withdrawal was invalid from the outset, then the Board must address that evidence. Here, there is no such evidence. Nothing suggests that Mr. Martinez's withdrawal was invalid from the beginning or void due to, for example, him lacking capacity to make the withdrawal. There is only his contention of a possible misunderstanding about the effect of the withdrawal. And, given the Board's findings, we don't see how the Board on remand could reach a different conclusion about the timing of the March 2010 TDIU application; this is true particularly when there is a plausible basis in the record for those findings that the Board already made. *See Slaughter v. McDonough*, 29 F.4th 1351, 1355 (Fed. Cir. 2022) (holding that this Court should look to the circumstances of the case); *cf. Tadlock v. McDonough*, 5 F.4th 1327, 1336 (Fed. Cir. 2021) ("[T]he Veterans Court may affirm on a ground not considered by the Board and the VA if it is clear that the factual basis for such conclusion is not open to debate and the Board on remand could not have reached any other determination on that issue.").[12]

---

[12] We acknowledge the U.S. Supreme Court's recent *Calcutt* opinion, which stated that "if the grounds propounded by the agency for its decision 'are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.'" 143 S. Ct. at 1321 (quoting *Chenery*, 332 U.S. at 196). But here, we are not substituting what we consider to be a more proper basis. Instead, we are simply finding that the Board's determination has a plausible basis in the record and noting that this basis remains plausible even if the Board overstated the holding in *Hembree*.

*5. Mr. Martinez's Fair Process Argument Is Underdeveloped and Unpersuasive*

Finally, Mr. Martinez argues that, even if section 7104(a) did not require the Board to consider the cognitive impairment evidence, principles of fair process required the Board to do so. "[E]ven in situations where no particular procedural process is required by statute or regulation, the principle of fair process may nonetheless require additional process if it is implicitly required when 'viewed against [the] underlying concepts of procedural regularity and basic fair play' of the VA benefits adjudicatory system." *Smith v. Wilkie*, 32 Vet.App. 332, 337 (2020) (quoting *Thurber v. Brown*, 5 Vet.App. 119, 123 (1993)). But Mr. Martinez does not identify any authority or otherwise explain why the cognitive impairment evidence shows that the general principles of fair process provide an exception to the withdrawal regulation here, except for summarily stating that they do. *See Coker v. Nicholson*, 19 Vet.App. 439, 442 (2006) (stating that an appellant must "plead with some particularity the allegation of error so that the Court is able to review and assess the validity of the appellant's arguments"), *rev'd on other grounds sub nom. Coker v. Peake*, 310 F. App'x 371 (Fed. Cir. 2008) (per curiam order).

And as much as Mr. Martinez asserts that the Board's failure to address the cognitive impairment evidence and the evidence of his prompt reassertion of his entitlement to TDIU deprived him of a chance to be heard and meaningfully participate in the adjudication of whether the withdrawal was valid, Appellant's Reply Br. at 8-9, the Court finds this unpersuasive for three reasons. First, it is undisputed that VA informed Mr. Martinez and his VSO representative one day after he submitted his withdrawal that he should contact VA immediately if withdrawal was not his intent. R. at 3699. Second, Mr. Martinez was represented before the Board by an attorney, a member of the same law firm now representing him here, who did not raise the cognitive impairment issue before the Board. R. at 28-29, 2806, 2853. Third, the Board addressed the argument that the attorney did raise (the treatment of the March 2010 TDIU application). R. at 12, 3651-53, 3667, 3676. In short, Mr. Martinez had full opportunity to tell VA that he didn't mean to withdraw his extraschedular TDIU appeal or, with help from his attorney, to raise to the Board the issue of his cognitive impairment impacting the validity of his withdrawal of that appeal, but he did not do so.

## C. The Dissent

Before we conclude, we will briefly address the well-articulated concerns of our dissenting colleague. Fortunately, we don't think we are too far apart, at least when it comes to how VA

19

should handle the hypothetical Patty Pilot used to showcase our colleague's concerns. Because her full story is in the dissent, we provide only this limited spoiler—a day after filing a facially valid withdrawal of her appeal with VA, Ms. Pilot contacts VA to ask when she will get benefits for the claim she just withdrew. So is she stuck with VA potentially ignoring this situation absent a rule that requires VA, after receiving an unambiguous written withdrawal, to consider whether the withdrawal was done with full understanding of the consequences based on post-withdrawal actions? We think not.[13]

Although Ms. Pilot (or her circumstance) is not before the Court, if she were, her next-day submission that was incongruent with her election to withdraw an appeal may raise red flags for VA and call for a response if it, alone or together with the evidence of record, does more than "call into doubt [her] intent and understanding of the withdrawal." *Hembree*, 33 Vet.App. at 7. Although *Hembree* held that "when the written document is not ambiguous, the veteran's subsequent conduct does not come into play," *id.*, we clarify today that VA may be required to address subsequent evidence that strikes at the very validity of the withdrawal. And as far as our rule today goes—although we don't set out a hardline one—her action may reasonably require the Board to address whether what happened is evidence of "mental incompetence, duress or fraud." *Collins*, 45 F.3d at 1573.[14] But that's simply not what we have here.

True, Mr. Martinez sent VA a document he now argues raised questions about his withdrawal. But the Board addressed that and made a factual finding that his correspondence responded to a VA letter. R. at 12. As we've explained, the Board's factual finding is plausible and we see no room to disturb it. *Supra* at 12. Thus, as far as the factual similarity between Ms. Pilot and Mr. Martinez goes, the Board addressed the relevant correspondence. And we think our rule today may still oblige the Board to deal with the veteran who may take such drastically inconsistent actions.

---

[13] In addition to the possibilities discussed here, Ms. Pilot would have other options for undoing a withdrawal. *See supra* note 6.

[14] Although in *Collins* the Federal Circuit was not dealing with the VA claims system, it was dealing with statutes and regulations addressing benefits aimed at veterans. *Collins*, 45 F.3d at 1570–71 (explaining the retirement credit available to those with "active duty military service performed after 1956 under both the [civil service retirement system] and the Social Security System"). "The solicitude of Congress for veterans is of long standing." *United States v. Oregon*, 366 U.S. 643, 647 (1961). And we don't think that would have been lost on the Federal Circuit when dealing with the question of a voluntary election by a veteran in *Collins*.

Where we part ways, it seems, is with whether the Board's focus needs to be on the veteran's understanding. Although we don't think it a bad idea for VA to look at the veteran's understanding in a withdrawal, that's ultimately not our call to make. *See Hembree*, 33 Vet.App. at 6. VA created a regulation. Mr. Martinez has not challenged that regulation. And the regulation does not impose the "understanding" requirement. If that requirement is found in the fair process doctrine or the Constitution, Mr. Martinez has not made that case today. And so, at the risk of sacrificing brevity on the altar of clarity, we repeat that at no time does the Board have to be concerned with a veteran's understanding of the written withdrawal because *Hembree* clearly held that "the regulation does not leave room for us to read into it a requirement for an affirmative inquiry into whether the withdrawal is done with full understanding," 33 Vet.App. at 5; instead, the Board should look to those situations that might invalidate a written election, such as mental incompetence, duress, or fraud. And, appellants who were confused (but are competent) can promptly reply when VA asks if they did not intend to withdraw.

Thus, what we are left with is a case in which Mr. Martinez focused his briefing before VA and this Court on the subjective understanding requirement we had rejected in *Hembree*. Perhaps recognizing this, he made a late stage pivot to hastily construct a theory about cognitive impairment. We reaffirm the *Hembree* rule on understanding. To be clear, if our decision can be read, as the dissent suggests, as impermissibly making factual findings about the merits of the cognitive impairment theory, our point is that this issue was simply not raised by Mr. Martinez or the record before the Board. Thus, we don't fault the Board for not dealing with cognitive impairment in more depth.

As part of that analysis, we're not making factual assessments about disputed matters in the first instance. Instead, left with a plausible Board finding for why Mr. Martinez sent in a TDIU application after withdrawing his claim, we repeat the routine exercise of figuring out if issues such as mental incompetence, duress, or fraud, or even cognitive impairment as now alleged by Mr. Martinez, were raised by the claimant or reasonably raised by the record. *See Garner v. Tran*, 33 Vet.App. 241, 247 (2021) (explaining that, where the Board did not assess whether an issue was raised, the Court makes that determination in the first instance). Because they weren't, we see no reason to send this case back to the Board to reconsider the matter with the benefit of this opinion.

## D. Summary

In sum, we hold that the Board has to review the validity of a written withdrawal when the claimant or the record reasonably raises the issue. Because a withdrawal that complies with the regulation is effective when received, for a withdrawal to be invalid, something must have made it invalid before it was submitted. We leave for another case an in-depth consideration of what that can be. For now, we reject the Board having to inquire into subjective understanding, but agree that cognitive impairment could do the trick if, for example, it rendered the veteran mentally incompetent and thus incapable of withdrawing the appeal.

In any case, once the claimant or the record raises the validity issue, then the Board, under section 7104(a), must review all evidence relevant to the reason for the invalidity. Here, the Board properly addressed Mr. Martinez's argument for why he believed that the February 9, 2010, withdrawal was either ineffective or rescinded and, consistent with section 7104, considered all the evidence relevant to this claimed reason for disregarding the withdrawal. What's more, because Mr. Martinez did not raise the cognitive impairment argument before VA, and because Mr. Martinez acknowledges that there is nothing in the record itself that suggested that his cognitive impairment—either alone or in conjunction with the timing of his March 2010 TDIU application—impacted his withdrawal, the Board did not have to address the matter.

## III. CONCLUSION

On consideration of the above, the May 20, 2021, Board decision denying a TDIU effective date before February 9, 2010, is AFFIRMED.

ALLEN, *Judge*, dissenting: I respectfully dissent from the Court's decision to affirm the May 20, 2021, Board decision. Specifically, I disagree with the majority's narrow view of when the Board must consider evidence beyond the four corners of a withdrawal document. Also, because the Board misapplied *Hembree*, even under the majority's interpretation, remand is warranted for the Board to weigh the evidence under the correct legal rule in the first instance.

As I have done before,[15] I start with a hypothetical. Assume a veteran, Patty Pilot, has an appeal pending before the Board for service connection for headaches. She submits a written

---

[15] *See Euzebio v. Wilkie*, 31 Vet.App. 394, 408 (2019) (J. Allen, dissenting), *vacated sub nom. Euzebio v. McDonough*, 989 F.3d 1305 (Fed. Cir. 2021).

withdrawal to the Board that meets the requirements of § 19.55 and *Hembree*; it includes her name and file number and specifically states, "I wish to withdraw my claim for service connection for headaches." The very next day, Ms. Pilot submits a new statement to VA, recounting her submission from the previous day and then asking: "Now that I have submitted a withdrawal, when can I expect to start receiving payments for my headaches?"

Under the majority's reasoning, the Board could ignore the fact that Ms. Pilot seemed to not understand the consequences of her withdrawal, specifically that it would end her appeal, because Ms. Pilot's circumstances do not on their face call into question the validity of her withdrawal document. At best, the majority's holding would allow Ms. Pilot to file a new NOD, if the time period for doing so had not passed, or respond to a letter that VA may send asking if she is sure she wants to withdraw her appeal.[16] But given Ms. Pilot's seemingly contradictory actions, it is not clear that she would understand these options. In my view, a rule that leaves Ms. Pilot in this position cannot be correct, and thus I must respectfully dissent.

Before turning to where my views diverge from my colleagues, I first note our areas of agreement. I agree with the majority's summary of the holding in *Hembree*,[17] and I acknowledge that *Hembree* left open a question of "[w]hether any post-withdrawal information *could* call the propriety of that withdrawal into question."[18] Like the majority, I also think that the answer to *Hembree*'s open question is yes, there are circumstances in which VA must look beyond the withdrawal to consider other evidence that may be relevant to the propriety of the withdrawal.[19] I also agree that section 7104(a) requires the Board to consider the full record when a question about the propriety of a withdrawal is raised, either expressly by a claimant or reasonably by the record.[20] And finally, I agree with the majority that "if the claimant or the circumstances of the withdrawal reasonably raised a question about the withdrawal's validity, the Board must address the matter."[21]

Where our views diverge is that I see questions about the validity of a withdrawal as an *example* of the circumstances that can call the propriety of a withdrawal into question, rather than

---

[16] *See ante* FN. 6.

[17] *Ante* at 8.

[18] *Ante* at 1-2 (quoting *Hembree v. Wilkie*, 33 Vet.App. 1, 7 (2020)).

[19] *See ante* at 2.

[20] *Ante* at 2, 10.

[21] *Ante* at 2.

the *only* circumstance that *Hembree* contemplated. Simply stated, the majority's holding is too narrow.

To provide context, I return to *Delisio v. Shinseki*, which provided that an oral withdrawal is effective only where it is "explicit, unambiguous, and done with full understanding of the consequences of such action on the part of the claimant."[22] In articulating these factors for an effective oral withdrawal, the *Delisio* Court was writing on a clean slate, unconstrained by a regulation or other legal authority that specifically addressed oral withdrawals. And the Federal Circuit later clarified that, in the context of oral withdrawals, the Board must "faithfully adhere[] to that standard" by applying all three of the *Delisio* factors.[23] The Federal Circuit held that by setting out the three factors for an effective verbal claim withdrawal, "the *Delisio* standard provides a bulwark against the inadvertent or uninformed forfeiture of a veteran's rights."[24]

In contrast, the *Hembree* Court was constrained by a regulation that specifically spelled out the requirements for an effective written withdrawal.[25] And in *Hembree*, the Court held, correctly in my view, that the *Delisio* factors do not apply to written withdrawals because the regulation "does not leave room for us to read into it a requirement for an affirmative inquiry into whether the withdrawal is done with full understanding."[26] This means that in most cases involving a written withdrawal, VA will have no occasion to consider a claimant's understanding and that VA certainly is not required to consider a claimant's understanding in every case in order for a withdrawal to be effective. By and large, when the regulatory factors are met, the inquiry ends. But the question left open by *Hembree*, for me, is whether there is ever any room for considering a claimant's understanding when it comes to written withdrawals. I believe the answer to that question is yes.

The majority, however, disagrees. After stating the open *Hembree* question and providing that, yes, post-withdrawal information could call the propriety of that withdrawal into question,[27] the majority's opinion shifts focus from the "propriety" of a written withdrawal to the "validity" of

---

[22] 25 Vet.App. 45, 57 (2011).

[23] *Acree v. O'Rourke*, 891 F.3d 1009, 1014 (Fed. Cir. 2018).

[24] *Id.* at 1013.

[25] *See* 38 C.F.R. § 19.55.

[26] *Hembree*, 33 Vet.App. at 5.

[27] *Ante* at 2.

a written withdrawal. And it is clear that the majority does not include a lack of understanding in a question of a written withdrawal's validity.[28] This would leave our hypothetical Ms. Pilot out of luck.

In my view, the key to *Hembree*'s rule is that VA is not required to undertake an *affirmative inquiry* into a claimant's understanding under the regulation. I agree that "the Board should ordinarily confine itself to deciding whether the withdrawal is valid based on examining the written submission."[29] But when a veteran expressly argues that he or she did not understand the consequences of that withdrawal, or the evidence of record reasonably raises a question about the veteran's understanding, VA has an obligation to address that question. And in addressing that question, section 7104(a) requires VA to consider the full record.

That is as far as this case would require us to go because the Board decision on appeal slammed the *Hembree* door shut when it failed to look beyond the four corners of Mr. Martinez's withdrawal document. The Board incorrectly found that although *Hembree* provided that there may be circumstances "that call into question the propriety of a written withdrawal, this case is not one of them because the withdrawal was unambiguous on its face."[30] The Board seemed to imply that, in order for it to consider evidence outside of the withdrawal document, that document must be ambiguous on its face. But *Hembree* left open the possibility of looking beyond the withdrawal document in some instances where the regulatory requirements are met. The Board's analysis did not include a discussion of the evidence under the correct rule of law. The Federal Circuit has made it clear that we are a Court of *review* not *first-view*.[31] Thus, this Court cannot make the necessary factual findings in the first instance. We are limited to the analysis the Board provided. And that analysis was built on a misapplication of *Hembree*, meaning that the Board did not assess the facts under the correct legal standard. We are constrained to review what the Board did and cannot go beyond its analysis to resolve matters that may still be open for debate.[32] Because the

---

[28] *Ante* at 2, 9, and 10 (explaining that "validity" involves an inquiry about whether a "withdrawal was void" from the beginning),

[29] *Hembree*, 33 Vet.App. at 6.

[30] *See* R. at 10.

[31] *See Tadlock v. McDonough*, 5 F.4th 1327, 1337 (Fed. Cir. 2021) (holding that the Court cannot make de novo findings of fact or otherwise resolve matters open to debate); *see also Slaughter v. McDonough*, 29 F.4th 1351, 1355 (Fed. Cir. 2022).

[32] *Tadlock*, 5 F.4th 1327 at 1337.

Board foreclosed the possibility of considering Mr. Martinez's understanding of his withdrawal when he reasonably raised a question about his understanding, I would remand this matter for the Board to consider the evidence of record in the first instance under correct application of *Hembree*.[33]

That VA cannot ignore evidence that a veteran may not have understood the consequences of withdrawal stems from the pro-veteran, nonadversarial nature of the VA adjudication process.[34] "The Board is obligated to ensure that it provides to appellants fair process in the adjudication of their claims."[35] "[E]ven in situations where no particular procedural process is required by statute or regulation, the principle of fair process may nonetheless require additional process if it is implicitly required when 'viewed against [the] underlying concepts of procedural regularity and basic fair play' of the VA benefits adjudicatory system."[36] Thus, even though the regulation and *Hembree* do not impose an obligation on VA to question a claimant's understanding in every case in order to find a withdrawal valid, fair process may require VA to consider a claimant's understanding if the evidence or claimant raises an issue about that matter. Returning to our hypothetical Ms. Pilot, the circumstances of her case certainly call into question her understanding, and VA can hardly ignore those circumstances in its pro-claimant, nonadversarial adjudicatory system.

This Court and the Federal Circuit have pointed out the importance of the pro-claimant nature of the VA system when it comes to withdrawals. In *Acree*, the Federal Circuit held that the *Delisio* standard for verbal withdrawals "comports with the 'uniquely proclaimant nature' of the system for adjudicating claims for veterans' benefits."[37] The court noted the importance of providing "a bulwark against inadvertent or uninformed forfeiture of a veteran's rights."[38]

---

[33] I note that even if I agreed with the majority's view of the law, I would still remand this matter for the Board to consider the correct application of the law in the first instance. This Court is ill-suited (not to mention prohibited by law) to engage in the factfinding necessary to apply even the narrow rule the majority announces today. *See Tadlock*, 5 4th at 1337-38.

[34] *See Hodge v. West*, 155 F.3d 1356, 1362 (Fed. Cir. 1998).

[35] *Smith v. Wilkie*, 32 Vet.App. 332, 337 (2020).

[36] *Id.* (quoting *Thurber v. Brown*, 5 Vet.App. 119, 123 (1993)) (alteration in original).

[37] 891 F.3d at 1013 (quoting *Hensley v. West*, 212 F.3d 1255, 1262 (Fed. Cir. 2000).

[38] *Id.*

Additionally, this Court in *Hembree* commented that "the Board should not lose track of the pro-claimant nature of the VA system" in assessing a withdrawal.[39]

It is this unique status of veterans in the VA adjudicatory process that distinguishes this case and withdrawals in the VA system from the consequences of written elections in other contexts. In this regard, the majority relies on the Federal Circuit's *Collins* decision to showcase that the Board can rely on a written withdrawal in most cases, except when mental incompetence, duress, or fraud is shown.[40] But in *Collins*, the Federal Circuit reviewed a Merit Systems Protection Board's decision that denied credit under the Civil Service Retirement System where a government retiree urged the Board not to rely on his "mistaken" election on a form.[41] Because federal government retirees are not a part of the same uniquely pro-claimant system that veterans enjoy, the holding in *Collins* is not as persuasive as it may appear on a first read.[42] In fact, the Federal Circuit has relied on the special status of veterans in adopting rules that would not fit comfortably in other contexts.[43] Thus, the pro-claimant nature and history of the VA adjudicatory process counsels in favor of a broader reading of the *Hembree* exception than the majority crafts.

My colleagues have responded to my hypothetical about Ms. Pilot,[44] and I am heartened to learn that the majority appears to accept that Ms. Pilot would come within the rule they articulate today. I confess that (as what I've written above makes clear) I would not have thought that was the case. But, of course, I take my colleagues at their word that a veteran like Ms. Pilot, who takes contradictory actions as I've described, would fit within the rule this case adopts.

However, although I read the majority's rule to capture my concern based on the comments focused on the dissent, I am still unable to join the opinion. I fear that the rule the majority articulates is unclear, paving the way for repeated litigation to find the line where a claimant's understanding becomes relevant for the Board to consider in the context of determining the validity

---

[39] *Hembree*, 33 Vet.App. at 6.

[40] *Ante* at 10 (quoting *Collins v. Off. of Pers. Mgmt.*, 45 F.3d 1569, 1572-73 (Fed. Cir. 1995)).

[41] *Collins*, 45 F.3d at 1572-73.

[42] *See United States v. Oregon*, 366 U.S. 643, 647 (1961) ("The solicitude of Congress for veterans is of long standing.").

[43] *See Taylor v. McDonough*, 71 F.4th 909 (Fed. Cir. 2023) (holding effective date statute unconstitutional as applied to veteran who was part of top secret program that prevented him from filing for disability benefits); *see also Euzebio*, 989 F.3d at 1326 (noting "the importance of systemic fairness and the appearance of fairness in the context of veterans' benefits" in requiring a direct relationship, rather than relevance, in the constructive possession context).

[44] *Ante* at 19-21.

of a withdrawal. Indeed, I do not see a vast difference between Ms. Pilot's circumstances and Mr. Martinez's, and I struggle to see how one falls within the majority's holding but the other does not.

Ms. Pilot, in the facts of my hypothetical, has no mental disorders or other signs that mental capacity is a concern. The only factor that "may raise red flags for VA and call for a response" is her inconsistent actions.[45] And Mr. Martinez also took inconsistent actions, when on the very same day he requested to withdraw his TDIU appeal, he also filed a claim for an increased PTSD rating that raised potential entitlement to TDIU.[46] The majority goes to great lengths to explain that these actions were "not necessarily contradictory and can seemingly be reconciled."[47] But the Board did not provide any such discussion about the same-day filings or explore either possibility, whether his actions were a litigation strategy or a sign that he did not understand what withdrawing his claim meant (like Ms. Pilot). The Board noted these actions occurred simultaneously,[48] but it did not discuss how such action may raise "red flags" about Mr. Martinez's withdrawal. As my colleagues note, inconsistent actions from Ms. Pilot "would reasonably require the Board to address whether what happened is evidence of 'mental incompetence, duress or fraud.'"[49] But why is the same not true for Mr. Martinez?

Even if the majority is correct that the Board's consideration of Mr. Martinez's TDIU withdrawal provided a plausible basis for it to have rejected the filing of a PTSD application the same day, the Board considered this action under the wrong legal rule, which should warrant remand. But a review of the Board decision reveals no discussion of Mr. Martinez's inconsistent actions, and the majority does not point to any such discussion. Maybe my colleague's explanation for why Mr. Martinez's actions were not sufficient to demonstrate any issue with his withdrawal is correct. Who knows? But the key is that this is a discussion that should come from the Board in the first instance.

Ultimately, what's good for the goose is good for the gander. If Ms. Pilot's inconsistent actions would raise red flags that the Board should address, then the same should be true for Mr. Martinez. The Board should have discussed whether Mr. Martinez's inconsistent actions, along

---

[45] *Ante* at 20.

[46] R. at 3715, 3713.

[47] *Ante* at Note 8.

[48] R. at 8.

[49] *Ante* at 20 (quoting *Collins*, 45 F.3d at 1573).

with the other evidence of record, raised the possibility of mental incompetence, duress, or fraud under the majority's rule (assuming that we accept that one never looks at subjective understanding). This Court is not the correct forum to make these determinations in the first instance.[50]

In sum, while I agree with much of the majority's decision, I can't join the well-written opinion because it does not go far enough. A rule that allows VA to consider evidence that a claimant did not understand withdrawal in one appeal while holding it does not matter for another claimant is inconsistent with the very foundation of the VA benefits system. We need not explore the contours of what I view as the appropriate rule today.

It may be that the circumstances that call for the Board to assess a claimant's misunderstanding are narrow. But those circumstances exist, and we should allow the Board to reconsider this matter under the correct legal standard. Therefore, I respectfully dissent.

---

[50] *Tadlock*, 5 4th at 1337-38.